## SCOTT v. BRAKEL *et al.*

### No. 2377.    Opinion Filed October 27, 1914.

(143 Pac. 510.)

1.    INDIANS — Age — Conclusive Evidence—"Enrollment Record." The "enrollment records of the Commissioners to the Five Civilized Tribes" which section 3 of the act of Congress, approved May 27, 1908 (35 St. at L. 312, c. 199), declares "shall hereafter be conclusive evidence as to the age" of any enrolled citizen or freedman of said tribes, embrace and include all of the testimony and exhibits tending to establish age that were in evidence before the Commission and the conclusions of the Commission based thereon, from the date of the application for enrollment of any particular allottee up to the time of the ascertainment by the Commission as to whether the name of such allottee was entitled to be placed upon the roll of the nation in which he claimed citizenship.

2.    INDIANS—Age—Conclusive Evidence—Census Card. Where it appears that the "census card" constitutes the complete "enrollment records," it is admissible as conclusive evidence of age, not as a "census card," but as the "enrollment records," when so certified by the proper officer.

3.    INDIANS—Decision of Commission—Conclusiveness. The Commission to the Five Civilized Tribes was a quasi judicial tribunal, empowered to determine who should be enrolled as citizens and freedmen of those tribes, what lands should be allotted to each, and in what way, and its adjudication of those questions and of every issue of law and fact which it was necessary for it to determine in order to decide them is conclusive and impervious to

Scott v. Brakel et al.

collateral attack. But its decision, recital, or report regarding issues the determination of which was not indispensable to enable it to decide who should be enrolled, what land should be allotted to those enrolled, and how, is, in the absence of special legislation, such as Act May 27, 1908, c. 199, 35 St. at L. 313, without judicial or other conclusive effect.

4.   INDIANS — Determination of Ages — Enrollment Records—Conclusiveness. The Commission had no jurisdiction in making its enrollment of the citizens and freedmen of the tribes to determine and conclusively adjudge their respective ages. In the determination of rights which accrued and of the effect of transactions concluded prior to May 27, 1908, the enrollment records of the Commission are not conclusive evidence of the age of any Indian citizen or freedman enrolled thereon.

(Syllabus by the Court.)

Kane, C. J., and Turner, J., dissenting in part.

*Error from District Court, Okmulgee County;*
*W. L. Barnum, Judge.*

Action by Alexander Scott against W. F. Brakel and others. Judgment for defendant First National Bank of Okmulgee, and plaintiff brings error. Reversed and remanded.

*Murphey & Noffsinger* and *Geo. S. Ramsey*, for plaintiff in error.

*Belford & Hiatt*, for defendants in error.

*S. T. Bledsoe, amicus curiae.*

KANE, C. J.   This was an action to quiet title and cancel certain instruments executed by Walter Scott, a Creek freedman, whereby he attempted to lease and otherwise incumber or convey title to part of his allotted lands in the Creek Nation to each of the parties to this action, or their respective grantors. The plaintiff alleges that he purchased the land involved from the said Walter Scott on the 22d day of January, 1908, at which time the grantor had attained his majority; that the deed to Brakel was executed on the 19th day of November, 1906, at which time said Walter Scott was a minor; that the lease executed to Skelton was executed on the 31st day of December, 1906, at which time said Walter Scott was a minor; that the warranty deed executed to the defendant Henry W. Carter was

executed on the 12th day of September, 1907, at which time
Walter Scott was a minor; that on the 7th day of December,
1907, said Walter Scott executed another warranty deed to
Henry W. Carter, and that at said time he was a minor; that on
the 11th day of December, 1907, Henry W. Carter, one of the
defendants herein, executed a warranty deed of conveyance to
said land to J. B. Levy and E. L. Fairbanks, but that at said
time Henry W. Carter held no title to said land and could not
convey to said defendants; that on the 14th day of December,
1907, defendants Levy and wife and Fairbanks and wife exe-
cuted a warranty deed to said tract of land to the First National
Bank of Okmulgee, Okla.; that at the time of the execution of
said deed, said defendants Levy and Fairbanks had no title to
said land, and could not convey any to said First National Bank;
that by reason of the minority of said Walter Scott, all of said
deeds, leases, and other instruments were null and void. Where-
fore he prays that said instruments be canceled, set aside, and
held for naught, and that title in fee simple be declared in said
plaintiff. At the trial of the cause and throughout the record
it is conceded that the age of Walter Scott at the time he exe-
cuted the various instruments hereinbefore mentioned and the
proper method of establishing the same are the only serious ques-
tions involved. To sustain their various contentions upon this
point the plaintiff and the defendants offered parol and documen-
tary evidence consisting of oral statements by the allottee and
others, who pretended to possess information concerning his age,
a marriage license, and a certificate of marriage issued to Walter
Scott, and a card entitled an "Enrollment Card." The court sus-
tained an objection to the introduction of the card, remarking:

"It is admitted that Walter Scott, the allottee, was enrolled
under enrollment number 2670, as a Creek freedman of the
Creek Tribe of Indians."

Thereupon, after finding that Walter Scott was a minor, as
shown by the enrollment card, at the time he executed the deeds
to Alexander Scott and W. F. Brakel, and the oil and gas min-
ing lease to L. S. Skelton, and that said Walter Scott reached
his majority in September, 1907, and was of full legal age at

the time he executed and delivered the deed to Henry W. Carter, and said deed conveyed all the right, title, and interest of said Walter Scott to the said Henry W. Carter, who in turn conveyed the same to the defendants Levy and Fairbanks, who in turn conveyed the same to the First National Bank of Okmulgee, and that said First National Bank of Okmulgee is now the holder of the fee-simple title to said real estate, the trial court decreed that the title and possession of said First National Bank of Okmulgee so conveyed be quieted as against said plaintiff, Alexander Scott, and against its co-defendants, Brakel, Carter, Skelton, Levy, and Fairbanks, and any and all persons claiming under them, or any of them. To reverse this decree this proceeding in error was commenced.

The questions presented for review upon this record may be epitomized as follows:

(1) What constitutes the "enrollment records of the Commissioners to the Five Civilized Tribes" under that part of section 3 of the act of Congress, approved May 27, 1908 (35 St. at L. 312, c. 199), which provides:

"The rolls of citizenship and of freedmen of the Five Civilized Tribes approved by the Secretary of the Interior shall be conclusive evidence as to the quantum of Indian blood of any enrolled citizen or freedman of said tribes and of no other persons to determine questions arising under this act and the enrollment records of the Commissioner to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age of said citizen or freedman."

(2) Does the act apply to cases tried subsequent to the passage and approval of the act, where the instrument concerning which the question of minority is material was executed prior thereto?

The language of this section is so clear that it seems strange so much controversy has arisen as to its meaning. The most elementary canon of construction is that where the meaning of the language used by the Legislature is plain, it must be given effect by the courts. Otherwise, say the authorities, the courts would be assuming legislative authority. *Choctaw, etc., Ry. Co. v. Alexander,* 7 Okla. 591, 54 Pac. 421; *Idaho Mut. Co-op. Ins.*

*Co. v. Myer*, 10 Idaho, 294, 77 Pac. 628. Therefore, we take it, the language used in this section means what it says—"that the records of the Commissioners to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age of said citizens or freedmen" whenever that question becomes material in any transaction affecting the alienation of their allotted lands. A somewhat more difficult question is, What constitutes "the enrollment records of the Commissioners to the Five Civilized Tribes"? In order to answer this question intelligently, it will be necessary to keep in the mind's eye a great portion of the prior legislation enacted by Congress, with a view to allotting the lands in the Indian Territory in severalty to the citizens and freedmen of the Five Civilized Tribes, something of the conditions which made this work expedient, and the nature, power, and jurisdiction of the Dawes Commission, the tribunal intrusted with the duty and vested with authority to perform this— as it turned out to be—gigantic undertaking. However, as these acts have been often under consideration in this and the federal courts, we will not attempt a detailed discussion of them, or to cite the many cases wherein, from time to time, they have been construed, the nature, power, and jurisdiction of the Commission defined, and the policy of the government adverted to. For the purpose of this phase of the case at bar, it suffices to say that some time prior to the passage of the act now under consideration, the Dawes Commission, pursuant to its understanding of the authority vested in it by Congress, did determine the respective ages of the citizens and freedmen of said tribes and prepare certain enrollment records, wherein the ages of said citizens and freedmen were recorded; that during the progress of this work conditions arose which made necessary the passage of section 3, *supra*. An appendix to the Congressional Record (42 Cong. Rec. pt. 8, p. 423) discloses that the act, as originally introduced, was referred for investigation to a committee of the House, where extended hearings were had thereon. The result of this discussion was that the committee in its report to the House recommended that the words, "and the enrollment record connected therewith," be stricken out of section 3. In other

words, if the recommendation of the committee was adopted, section 3 would make the rolls the exclusive evidence as to both the age and the quantum of Indian blood. In the Senate, section 3 was amended to read, "and the enrollment cards and records shall be conclusive evidence of the age of the said citizen," etc. The House refused to concur in the Senate's amendment, and in conference it was agreed to strike out all of the proposed amendment and insert in lieu thereof the words, "and the enrollment records of the Commissioners to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age of said citizen or freedman," as the bill now appears. The wavering attitude of the two houses on this point is probably explained by the fact that representatives of the Interior Department and various private interests appeared before the committees having the bill in charge, some urging that the bill should provide that the rolls be made conclusive evidence; others, that the enrollment records should be made conclusive evidence, both as to age and quantum of Indian blood. Whilst it was generally agreed that the "approved rolls" would constitute the best evidence as to quantum of blood, it was urged, at the hearing before the House committee, and probably before the Senate, that the enrollment records were better evidence of age than the approved rolls, the reason assigned therefor being that the records show everything that the roll shows, but they show the age more conclusively.

This brief bit of legislative history makes it quite clear that as the matter appeared to Congress, the "enrollment records" were something different from the "approved rolls" first recommended by the House as conclusive on both quantum of blood and age, and something more than the "census card" recommended by the Senate as conclusive upon the question of age. If we are correct in this, it would follow that to hold the "approved rolls" to be conclusive as to both age and quantum of blood would be to put a construction upon the act which Congress specifically repudiated, and to hold that the "approved rolls" are conclusive as to age would be to insert into the act by construction an amendment which the House refused to ac-

cept, and which the conference committee of both houses finally rejected. And the distinction between the "approved rolls" and the "enrollment records," so clearly recognized by Congress, finds its basis in many prior acts of Congress pertaining to the allotment of the Indians and freedmen, and the practical interpretation placed upon them by the Dawes Commission and the Department of the Interior. Under the procedure directed by the Interior Department, the Dawes Commission required each person applying to be enrolled as a citizen of the Five Civilized Tribes to make a statement under oath as to his age, sex, degree of blood, family relationship, etc., which statements were reduced to writing in the present census-card form at the time of the examination, and became the record in reference to the enrollment of each individual applicant. The enrollment records from which the approved rolls were compiled were made anticipatory to the preparation of the final rolls of citizens and freedmen, and were practically completed during the period intervening between the act of Congress of June 28,. 1898 (chapter 517, 30 Stat. 495), and the ratification of the agreement with the several tribes fixing the date after which no other person was to be enrolled. What came to be known as the "approved rolls" was nothing more than compilations from the enrollment records in the form of typewritten lists of the members of the tribes found entitled to enrollment with numbers opposite their names for the purpose of identification, and followed by typewritten numbers showing age, sex, degree of blood, and card number compiled from the enrollment records. These rolls, as prepared and submitted to and approved by the Secretary of the Interior, contained no computation of the age of any member of the tribes at any given date and the calculation of ages, as shown on the published rolls, is not uniform throughout the publication. No date is given for the calculation of the ages of Cherokee freedmen, and in the Creek Nation the public is warned against accepting the rolls as an evidence of age, as both the final roll of Creeks by blood and of Creek freedmen bear the notation:

"Ages shown on this roll are the ages shown on date of enrollment. To calculate present age of allottees, it will be neces-

sary to secure a certified copy of census card showing date of enrollment."

All of this and many other deductions deducible from the same sources, pointing the same way, inevitably lead to the conclusion that Congress intended "the enrollment records of the Commissioners to the Five Civilized Tribes" to include and embrace all of the testimony and exhibits tending to establish age that were in evidence before the Dawes Commission, and the conclusions of the Commission based thereon, from the date of the application for enrollment of any particular individual up to the time of the ascertainment by the Commission as to whether the name of such person was to be included upon the final roll of the nation in which he claimed citizenship.

It is true that in many instances the census card consists of an entry of a summary of the evidence of the applicant at the time the application was made, whilst in other instances, where the testimony of the applicant was not taken down by a stenographer and subsequently transcribed, the entries consisted of the epitomized statements of the witnesses reduced to census-card form. In such cases the census card is of necessity the enrollment record, and where the Commissioner to the Five Civilized Tribes certifies that the census card constitutes the entire enrollment record as to the person whose name appears thereon, that will be sufficient. There are many instances where the census card constitutes substantially the complete enrollment record. In such cases, it is admissible as conclusive evidence as to age, not as a census card, but as "the enrollment record," when so certified by the proper officer. In this part of the opinion all the Justices concur.

This court in *Yarbrough v. Spalding,* 31 Okla. 806, 123 Pac 843, held that Congress has the constitutional authority to make the enrollment record conclusive evidence of age.

It is next contended that, inasmuch as the deed to Alexander Scott was executed prior to the passage and approval of section 3, *supra,* the act, not being retroactive, but clearly prospective, has no application to his case. On this question Justices Loofbourrow, Riddle, and Bleakmore, a majority of the court, are of

the opinion that in making up the enrollment records the ascertainment of the respective ages of the allottees was not indispensable to enable the Commission to decide who should be enrolled, what land should be allotted to those enrolled, and how. Therefore the decision, recital, or report of the Commission in regard to that question, in the absence of special legislation, such as the act of May 27, 1908, is without judicial or other conclusive effect. Assuming the premise to be sound that the Commission had no jurisdiction, in making up its enrollment records of the citizens and freedmen of the tribes, to ascertain and adjudicate their respective ages, it would follow that in the determination of rights which accrued and of the effect of transactions concluded prior to May 27, 1908, the enrollment records of the Commission are not conclusive of the age of any Indian citizen or freedman enrolled thereon. *Hegler v. Faulkner,* 153 U. S. 109, 14 Sup. Ct. 779, 38 L. Ed. 653; *Williams v. Joins,* 34 Okla. 733, 126 Pac. 1013; *Perkins v. Baker,* 41 Okla. 288, 137 Pac. 661; *Malone v. Alderdice* (C. C. A.) 212 Fed. 668.

As the court obviously predicated its findings as to the age of the allottee at the time he executed the deed to Alexander Scott upon the enrollment card, the judgment rendered must be reversed and the cause remanded, with directions to grant a new trial and proceed in accordance with the views expressed above. Although the conclusion reached by the majority of the court is supported by high authority—indeed, by all the cases so far decided wherein the question has been directly passed upon—the writer of this opinion cannot concur therein. In my judgment the ascertainment and determination of the respective ages of the members of the tribes by the Commission was indispensable to a proper performance of the important duty intrusted to it by the Congress, and it was a grave error of law, as well as of public policy, for the courts ever to have allowed its findings and adjudications of that question to be impeached collaterally, unless it clearly appeared that in preparing such records the Commissioners committed some material error of law, or that misrepresentation and fraud were practiced upon

them, or that they themselves were chargeable with fraudulent practices. *Fast v. Walcott*, 38 Okla. 715, 134 Pac. 848.

Whilst in the early stages of the work of the Commission, the necessity for establishing the respective ages of the allottees, except as a means of identification or as an incident to taking the census required by the act of Congress, may not have been so apparent, the subsequent acts of Congress, removing restrictions from the lands of certain classes of allottees who had attained their majority, the coming of age of minors, thus removing restrictions from certain portions of their lands, and the attempted removal of restrictions by conferring majority by decree of court, as in *Truskett v. Closser*, 198 Fed. 835, 117 C. C. A. 477, and by marriage, as in *Jefferson v. Winkler*, 26 Okla. 563, 110 Pac. 755, and by questionable evidence *aliunde* the enrollment records of the Dawes Commission, as in many cases, etc., served to make more apparent the great importance of the adjudication of this question by the Commission, at a time when there was no incentive for fraud or perjury in its ascertainment, its indispensability to the efficient performance of the general scheme of allotment, and the wisdom of the Commission in its practical construction of the acts defining its powers and prescribing its duties in the premises. Section 3 of the Act of May 27, 1908, itself is a congressional recognition of the power of the Commission in the premises, as well as of the efficiency and thoroughness with which the power conferred had been exercised in that regard.

The conditions which made action by Congress expedient are epitomized by Mr. Ramsey, a lawyer of wide experience and information, in his brief *amicus curiae,* as follows:

"Conditions in this country are peculiar. In the older communities, a prospective purchaser of a piece of land encounters no difficulty in discovering the age of a young man or a young woman reared in the community. Generally, the statement of the father and mother, or their older brothers and sisters, is reliable. At any rate, the intending purchaser can safely rely upon the statements of the older citizens in the neighborhood as to the age of their neighbor's son or daughter. In this country, these negroes and Indians do not know their own age, or the

ages of their children, and, for a few dollars, will make an affidavit fixing the age beyond minority, in order to enable the allottee to sell his or her land and get the money. Even if the allottee is of age, as a matter of fact, and sells his land in good faith, only a few months will elapse before some grafter will appear, and, for a small consideration, bribe the father and mother, and also the allottee, to make an affidavit that the allottee was a minor at the time the first deed was made. This corrupt state of affairs induced Congress to put an end to such practices and exterminate such conditions by section 3 of the act of May 27, 1908."

It is obvious that this deplorable condition was not of sudden growth, and that the same necessity existed for the application of the act to all cases where the age of the allottee became material in determining the alienability of his allotted lands, whether the cause of action arose prior or subsequent to its passage.

If we keep in mind the conditions outlined above, it becomes quite clear that by the enactment of sections 2 and 3, *supra,* Congress not only intended to put an end to the saturnalia of bribery, perjury, and fraud possible under old conditions, but also to protect the Indians and freedmen against their own ignorance, cupidity, and improvidence, and against such unscrupulous persons who in their transactions with them in relation to their allotted lands might be tempted to take advantage of conditions and of the well-known defects of character of many of the allottees. This purpose would be but partially accomplished if the act were construed in such a way as to leave a zone within which such transactions would not be subject to the benign operation of the act. The same considerations of public policy which prompted Congress to pass the act persuasively call for a construction thereof by the courts which will bring within its purview as many as possible of the evils it was intended to ameliorate. It is true, as one of the learned counsel briefing this question says: "Congress cannot turn back the veil of time, nor stay the seasons in their clime." Congress has no power to establish rules which, under pretense of regulating the presentation of evidence, go so far as altogether to preclude a party from exhibiting his rights. But Congress, by agreement

with the people of the proposed state, reserved the power to "make any law or regulation respecting such Indians, their lands, property, or * * * rights." Section 1, Enabling Act (Act June 16, 1906, c. 3335, 34 St. at. L. 267); section 413, Williams' Ann. Const. Okla. And if the Act of May 27th constitutes a proper exercise of this reserve power, the rule of evidence enunciated could as well be made applicable to cases which arose prior, but were tried subsequent, to the passage of the act as to cases which arose wholly after that date. *Thompson v. Missouri*, 171 U. S. 380, 18 Sup. Ct. 922, 43 L. Ed. 204; *Hopt v. People*, 110 U. S. 514, 4 Sup. Ct. 202, 28 L. Ed. 262; *C., B. & Q. Ry. Co. v. Jones*, 149 Ill. 361, 37 N. E. 247, 24 L. R. A. 141, 41 Am. St. Rep. 278; *O'Bryan v. Allen*, 108 Mo. 227, 18 S. W. 892, 32 Am. St. Rep. 595. By an exercise of this reserve power, Congress in the same act (section 2) had already declared that the jurisdiction of the probate courts of the state of Oklahoma over the lands of minors shall be subject to the foregoing provisions; and the term "minor" or "minors," as used in this act, "shall include all males under the age of twenty-one years, and all females under the age of eighteen years," and this has been held to be a valid exercise of the reserve power of Congress, although in some respects repugnant to certain provisions of the state law upon the same subject. *Jefferson v. Winkler, supra.* Section 3 merely declares that all allottees who appear to be minors, as therein defined, upon the enrollment records, must hereafter be conclusively presumed to be such in all transactions concerning the alienation of their allotted lands. In other words, the two sections construed together mean that the term "minor" or "minors" includes all male and female persons whom the enrollment records show to be under the ages of 21 and 18 years, respectively, and such enrollment records, which heretofore have been the best evidence on the question of age, subject to collateral attack upon certain grounds, hereafter cannot be impeached collaterally upon any ground. And in so declaring Congress did not assume that all of the allottees who appear upon the enrollment records to be minors are so in fact. The rule of conclusive presumptions is not a rule of inference from testimony,

but a rule of protection as expedient, and for the general good. It does not, for example, assume that all landlords have good titles; but that it will be a public and general inconvenience to suffer tenants to dispute them; neither does it assume that all averments and recitations in deeds and records are true, but that it will be mischievous if parties are permitted to deny them. It does not assume that debts barred by the statute of limitations are paid, nor that every man, in the quiet possession of land for the period of prescription claiming it as his own, has a valid title by grant; but it deems it expedient that claims opposed by such evidence should not be countenanced and that society is more benefited by a refusal to entertain such claims than by suffering them to be made good by proof. In short, it does not assume the impossibility of things which are possible; on the contrary, it is founded, not only on the possibility of their existence, but on their occasional occurrence; and it is against the mischief of their occurrence that it interposes its protecting prohibition. 1 Greenleaf on Evidence (16th Ed.) section 32.