**CULLY v. MITCHELL et al.**

Circuit Court of Appeals, Tenth Circuit.
January 6, 1930.

No. 149.

Chester I. Long and W. E. Stanley, both of Wichita, Kan. (J. D. Houston, of Wichita, Kan., Peter Q. Nyce, of Washington, D. C., Austin M. Cowan, of Wichita, Kan., and Thomas H. Owen, of Oklahoma City, Okl., on the brief), for appellant.

N. A. Gibson and J. L. Hull, both of Tulsa, Okl. (T. J. Flannelly and Paul B. Mason, both of Independence, Kan., and West, Gibson, Sherman, Davidson & Hull, of Tulsa, Okl., for Prairie Oil & Gas Company; R. H. Hudson, of Bartlesville, Okl., for Phillips Petroleum Company; Benjamin C. Conner and Hunter L. Johnson, both of Tulsa, Okl., for Cortez Oil Company; G. J. Neuner, of Tulsa, Okl., for New York Petroleum Royalty Corporation; Arrington & Evans, of Shawnee, Okl., for George Laub and Central Valley Oil Company; W. C. Wood, of Wewoka, Okl., for E. W. Whitney and V. V. Harris; Norvell & Norvell, of Wewoka, Okl., for Guy G. Jameson and C. B. Billington; Goode, Dierker & Goode, of Shawnee, Okl., for C. B. Billington; and C. A. Summers, of Muskogee, Okl., for S. D. Mitchell and E. A. Hassman, on the brief), for appellees.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. The rolls of citizenship of the Five Civilized Tribes, approved by the Secretary of the Interior, carried the name of Maria Cully, the appellant, and opposite her name, under the heading "Blood," the fraction "¼." Under the Act of May 27, 1908 (35 Stat. 312), "All lands, including homesteads, of said allottees enrolled as * * * mixed-blood Indians having less than half Indian blood including minors shall be free from all re-

strictions." Section 1. The same act made provision for filing in the various counties of Oklahoma of "certified copies of such portions of said records as affect title to lands in the respective counties." Section 12, p. 316. The records of Seminole county showed the following, and nothing else:

"1827, Maria Cully; post office Senora; age 18; sex F.; blood ¼; description 5, 6, 7, and 8, 37.72 acres surplus."

The government issued a patent to her as a ¼ blood, and the defendants acquired, by conveyance through Maria Cully, interests in her land. This action is to set aside such conveyances, and for an accounting, upon the ground that Maria Cully was in fact a ¾ blood restricted Indian, and the conveyances not being approved by the Secretary of the Interior, were void and of no effect. The trial court found for the defendants, and this appeal follows.

The plaintiff does not contend that the quantum of her blood can be proved by evidence other than the approved rolls. Her contention is that one must look to all of the rolls of the Five Civilized Tribes. That elsewhere upon the Seminole roll appears the name of her mother, Es-ho-po-na-ka, listed as a half-blood. That on the Creek roll appears the name of one Washington Riley, listed as a full-blood. She says she is a daughter of Es-ho-po-na-ka and Washington Riley, and as a mathematical deduction from that fact, the rolls show her to be a ¾ blood Indian. In appellant's brief, she says that the identification of herself and parents "could have been done solely upon parol evidence." In this case, however, she proves her parentage by the oral evidence of herself, her brother and two acquaintances, and by reference to the census card of her mother. This card, which is a part of the enrollment records, but not a part of the approved rolls of citizenship, and a copy of which is not on file in the various counties, bears a number, 578. The same number appears opposite the name of appellant on the approved roll, under the heading "Census Card No.," but does not appear on the copy filed in the various counties. These cards are in the custody of the Superintendent of the Five Civilized Tribes. That card carries certain data as to Es-ho-po-na-ka, including her blood as ½, and lists her eleven children, the tenth of whom is the plaintiff. Plaintiff's age is given, her blood as "¼," and her father as "Washington Riley, Cr. Cit." The identity of her father with the "Washington Riley" appear-

ing on the Creek roll as a full-blood, is satisfactorily proven by the evidence. Having thus established her parentage, and identified them by evidence, the conclusion of the trial court that Maria Cully is in fact a ¾ blood, is correct.

Plaintiff futher contends that the finding that she is in fact a ¾ blood, does not dispute her own enrollment as a ¼ blood; first, because one who is a ¾ blood is a ¼ blood and more; second, because the parol evidence proved that when the Seminole roll was made up, the Dawes Commission only attempted to set out the quantity of Seminole blood, and disregarded other Indian blood. The roll itself is negative; it purports to be "Seminole roll Indians by blood"; the heading under which the fractions appear, is headed simply "Blood." Evidence was introduced which led the trial court to say, in a memorandum, that the roll disclosed only the amount of Seminole blood. And with this statement we agree.

The appeal presents for decision a question of vast and far-reaching importance. May a purchaser of land from a member of the Five Civilized Tribes rely upon the fraction of blood set opposite her name, as it appears on the records of the county in which the land is situate? Or must such purchaser resort to other enrollment records in the office of the Superintendent of the Five Civilized Tribes; and there ascertain her parentage; identify such parents with other Indians on other rolls; ascertain from the other rolls the blood of her parents; and from such investigation, compute the quantum of her blood? The importance of the question rests largely upon the fact, established by the evidence and well known generally, that titles have passed for more than twenty years in implicit reliance upon the fraction of blood opposite the name of the seller as shown by the approved rolls.

The question is, as we see it, solely one of statutory construction. It can no longer be doubted that the power of the government over Indian lands is plenary, and is a political power not subject to the control of the judiciary. Lone Wolf v. Hitchcock, 187 U. S. 553, 23 S. Ct. 216, 47 L. Ed. 299; United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 30 L. Ed. 228; Tiger v. Western Investment Co., 221 U. S. 286, 311, 31 S. Ct. 578, 55 L. Ed. 738; Williams v. Johnson, 239 U. S. 414, 36 S. Ct. 150, 60 L. Ed. 358; United States v. Candelaria, 271 U. S. 432, 46 S. Ct. 561, 70 L. Ed. 1023. The contention that the Act of May 27, 1908, if

construed as appellees contend, is beyond the power of Congress, is not sound. The cases cited to the effect that Congress may not make the finding of one fact conclusive evidence of the existence of another fact (Bailey v. Alabama, 219 U. S. 219, 31 S. Ct. 145, 55 L. Ed. 191; Manley v. Georgia, 279 U. S. 1, 49 S. Ct. 215, 73 L. Ed. 575; Western & Atl. R. Co. v. Henderson, 279 U. S. 639, 49 S. Ct. 445, 73 L. Ed. 884) have no application. Maria Cully, a ¾ blood Indian, has no vested right in restrictions against her alienation. A statute which removes such restrictions does not invade her rights. United States v. Jackson, 280 U. S. 183, 191, 50 S. Ct. 143, 74 L. Ed. ——; Welch v. Bank (8 C. C. A.) 15 F.(2d) 184. Congress constantly passes special acts removing restrictions, and their constitutionality has never been questioned, to our knowledge. Congress can pass an act removing restrictions as to certain Indians named in the act, or to certain Indians listed on an approved roll, without constitutional hindrance.

The Seminole roll, as far as it is involved herein, was approved on April 2, 1901. The rolls were ordered to be closed on March 4, 1907. Act April 26, 1906, § 2, 34 Stat. 137. On November 16, 1907, Oklahoma became a state. A large part of the land of eastern Oklahoma was under restrictions and exempt from state taxes. Restrictions had theretofore, on April 21, 1904, been removed from adult non-Indian members of the Five Civilized Tribes, except as to homesteads. Act April 21, 1904, 33 Stat. 189. On April 26, 1906, restrictions on full-bloods were reimposed for a period of 25 years. 34 Stat. 137. Congress then had to deal with mixed bloods. A general act was contemplated. Several solutions were available. It could have (1) removed restrictions according to the amount of Indian blood in fact, leaving the proof open to parol evidence; or (2) it could have removed restrictions according to the amount of Indian blood in fact, but narrowed the proof of such fact to the approved rolls, aided by other enrollment records; or (3) it could have removed restrictions according to the amount of Indian blood as shown by the enrollment, and narrowed the proof of that fact to specific documents then in existence. The substance of plaintiff's claim is that the second plan was adopted; the defendants contend that the third was.

■ The clearest proof of the intention of Congress is found in the statute. The first

and third sections of the Act of May 27, 1908, are:

"Sec. 1. That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of *said allottees enrolled as* intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions. All lands, except homesteads, of *said allottees enrolled as* mixed-blood Indians having half or more than half and less than three-quarters Indian blood shall be free from all restrictions. All homesteads of *said allottees enrolled as* mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of *enrolled* full-bloods, and *enrolled* mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe. * * *"

"Sec. 3. That the rolls of citizenship and of freedmen of the Five Civilized Tribes approved by the Secretary of the Interior shall be conclusive evidence as to the quantum of Indian blood of any enrolled citizen or freedman of said tribes and of no other persons to determine questions arising under this act, and the enrollment records of the Commissioner to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age of said citizen or freedman." 35 Stat. 312. [Italics ours.]

The italicized words silhouette the difference between the parties. Plaintiff ignores these words, and argues, in substance, that the statute means that "all allotted lands of * * * mixed-bloods of three-quarters or more Indian blood" shall not be subject to alienation; and that section 3 then limits the proof of the quantum of blood to approved rolls plus the census cards, together with such additional proof of identity and paternity as may be necessary. This, it seems to us, emasculates the statute of the italicized words. Our opinion, on the contrary, is that Congress removed the restrictions from "all lands of

said allottees *enrolled as* mixed-blood Indians having less than half Indian blood." That is what the statute says. By that language, Congress clearly pointed to certain rolls then in existence, and said, in substance, "Restrictions are removed from those persons who are listed there as less than half-bloods." Then, in order that no uncertainty might exist, and that there might be some certain and exclusive method of ascertaining a nebulous fact, and that some stability might exist as to land titles, Congress enacted section 3, by which it said, in clear language, that only the rolls of citizenship might be looked to for quantum of Indian blood; but as to age, one might look to all of the enrollment records of the Commissioner.

■ If the language of the statute is clear, as we think it is, resort to the legislative history, or to administrative construction, is not necessary. In this case, such aids to construction fortify the conclusion reached.

■ An indispensable link in plaintiff's case is the proof of her parentage. She proves that she is a ¾ blood, and not a ¼ blood, as she appears to be from the approved roll, by introducing the enrollment of Es-ho-po-na-ka, a Seminole half-blood, and Washington Riley, a full-blood Creek: That proves nothing as to her, until they are shown to be her parents. So she proves that parentage by oral evidence, and by the use of the census card. The proof is clear that the census cards are no part of the approved roll; they are not approved by the Secretary of the Interior; certified copies of them are not filed in the various counties. After the roll is approved, the census cards are stamped with the date on which the roll was approved by the Secretary of the Interior. They are kept in the custody of the Commissioner to the Five Civilized Tribes, and are indisputably a part of the "enrollment records of the Commissioner to the Five Civilized Tribes." Just as indisputably, they are not a part of the approved roll. The opinion in Scott v. Brakel, 43 Okl. 655, 143 P. 510, gives more of the legislative history of this act, and shows conclusively that Congress well understood the difference between the "approved roll" and the "enrollment records." Section 3 provides that the "rolls of citizenship and of freedmen of the Five Civilized Tribes approved by the Secretary of the Interior shall be conclusive evidence as to the quantum of Indian blood," while the same section provides that "the enrollment records of the Commissioner to the Five Civilized Tribes shall hereafter be conclusive evidence as to the age."

In the same section of the statute, Congress clearly differentiates between the "approved rolls" and the "enrollment records." For the court to permit "enrollment records" to be used where Congress has provided only the "approved roll" may be, is to rewrite the statute. Furthermore, when the bill was introduced in the House on January 29, 1908, it permitted the use of the enrollment records as proof of quantum of Indian blood. The section read:

"That the rolls of Citizens and of Freedmen of the Five Civilized Tribes approved by the Secretary of the Interior and the enrollment records connected therewith shall be conclusive evidence as to the age and the quantum of Indian blood of any enrolled citizen or freedman of said tribes to determine questions arising under this Act."

Upon recommendation of the Committee on Indian Affairs, the House struck out the phrase "and the enrollment records connected therewith." If the census cards can be resorted to, the courts simply put back into the statute the words Congress cut out. The Senate Committee again amended it, at the suggestion of the Secretary of the Interior, by permitting enrollment records as to age, but left the approved roll the only evidence of blood. This legislative history shows, beyond peradventure of a doubt, that neither the census cards, nor any other enrollment record, nor oral evidence, can be offered to show quantum of Indian blood. And without such evidence, plaintiff's case falls.

■ It is suggested that the Seminole roll only disclosed Seminole blood, and that Congress must have misapprehended the facts in that regard, else the bill would not have passed. If Congress made an error, it is for Congress to correct it. That Congress actually intended to remove restrictions according to the blood as shown by the fraction noted after each individual name as shown by the Seminole roll, is demonstrated by a comparison of that roll with the Report of the Committee in charge of this bill to the House. That report advised the House of the number of Seminoles affected by the act. Comparing that report with the approved roll, shows:

| Approved Roll | | Committee's Table |
|---|---|---|
| Full-blood | 1397 | 1399 |
| More than ½ | 176 | 180 |
| ½ | 373 | 394 |
| Less than ½ | 171 | 165 |
| | 2117 | 2138 |

There are 21 adopted citizens on the approved roll, not classified by blood. Add these to 2117, and the exact figure of the Committee's report, 2138, results. Presumably the Committee ascertained the quantum of blood of these 21 adopted citizens, and classified them accordingly, which would make the rolls and the report correspond exactly. Furthermore, the report of the Committee on the Act of April 26, 1906, in referring to the rolls of the Five Civilized Tribes, says:

"The degree of blood is to be settled by the rolls of the tribe, and I might state for the benefit of the House that the rolls give the quantum of blood of each member upon the roll." Vol. 10, Congressional Record, 59th Congress, page 1243.

We conclude, that when this bill was enacted, Congress was pointing directly at the Seminole approved roll, and was removing restrictions according to the fraction shown after each name on it.

■ The evidence fairly shows that the office of Indian Affairs in Washington and in Oklahoma retained or relinquished supervision over the lands of the Indians, according as the approved roll disclosed the blood of the individual allottee. An unrestricted patent was issued to the appellant for the lands here in litigation. Such administrative interpretation is persuasive evidence. As was said in Blanset v. Cardin, 256 U. S. 319, 326, 41 S. Ct. 519, 522, 65 L. Ed. 950:

"And there can be no doubt that the act was the suggestion of the Interior Department, and its construction is an assistant, if not demonstrative criterion, of the meaning and purpose of the act. Swigart v. Baker, 229 U. S. 187, 33 S. Ct. 645, 57 L. Ed. 1143; Jacobs v. Prichard, 223 U. S. 200, 32 S. Ct. 289, 56 L. Ed. 405; United States v. Cerecedo Hermanos, 209 U. S. 337, 28 S. Ct. 532, 52 L. Ed. 821. And the regulations of the department are administrative of the act and partake of its legal force."

The force of departmental construction of acts concerning Indians is greatly fortified by the opinion of Chief Justice Taft, in United States v. Jackson, 280 U. S. 183, 50 S. Ct. 143, 74 L. Ed. ——.

The case of United States v. Ferguson, 247 U. S. 175, 38 S. Ct. 434, 62 L. Ed. 1052, strongly supports the appellees' position. That case arose under the Act of April 26, 1906, which had a similar provision as to the conclusiveness of the rolls. The land there in controversy had former-

ly belonged to a Creek. After his death, one Yekcha, his sole heir, succeeded to the title. If Yekcha was not a full-blood Indian, he could convey the land, which he did. He later contended that he was, in fact, a full-blood. It appears that his name appeared on the Seminole roll as a half-blood. It was admitted that the father was a full-blood Creek, and it was sought to be shown by parol evidence that his mother was a full-blood Seminole, although her name did not appear on any roll. The Supreme Court said that this proof was not admissible. Speaking of the rolls, the Supreme Court said:

"The rolls were made and approved by the Secretary; a statement of the age, sex, and quantum of Indian blood of each member being included in the descriptive matter thereon. The Act of April 26, 1906, supra, besides making the presence or absence of restrictions on the alienation of allotments dependent on the quantum of Indian blood possessed by the allottee or heir, declared that 'the quantum of Indian blood possessed by any member of said tribes shall be determined by the rolls of citizens of said tribes approved by the Secretary of the Interior.' The Act of June 21, 1906, c. 3504, 34 Stat. 325, 340, directed that a printed and bound copy of the approved rolls be deposited 'in the office of the recorder in each of the recording districts for public inspection.' Printed copies were so deposited."

The trial court had rejected the testimony proffered to the effect that his mother was a full-blood Seminole, and therefore Yekcha was a full-blood; the trial court interpreted the roll as meaning that he was an Indian of the half-blood, and not merely a half-blood Seminole. The Supreme Court then held—

"We think the court rightly excluded the oral testimony and gave controlling effect to the approved roll. When Congress came to make a difference between full-blood and mixed-blood Indians, by subjecting the former to restrictions not applied to the latter, it evidently deemed it better for the Indians and all concerned that there be some fixed, easily accessible and reasonably reliable evidential standard by which to determine, for the purpose of the matter then in hand, who were of the full-blood and who of the mixed-blood. Congress had power to deal with the subject, and from among the standards which might have been prescribed it selected the rolls made at its direction by the commission charged with

making the allotments. Not improbably it was thought that the rolls, even if not altogether free from mistake and error, would be quite as reliable as oral testimony and would have the advantage of being both easily accessible and enduring. But, passing the reason for it, Congress directed that the quantum of Indian blood 'be determined' by the approved rolls, and it did this in a connection which leaves no doubt of its purpose to give controlling effect to the rolls. Emphasis was given to this purpose in the Act of May 27, 1908, c. 199, 35 Stat. 312, where, in again dealing with restrictions on the alienation of allotments, it was provided that the approved rolls 'shall be conclusive evidence as to the quantum of Indian blood of any enrolled citizen or freedman of said tribes and of no other persons to determine questions arising under this act.' Both the federal and state courts in Oklahoma have for several years applied the view here expressed. Bell v. Cook (C. C.) 192 F. 597, 604, 605; Yarbrough v. Spalding, 31 Okl. 806, 123 P. 843; Lawless v. Raddis, 36 Okl. 616, 129 P. 711. It hardly requires statement that the court rightly interpreted the entry of Yekcha's enrollment, before quoted. It neither names nor says anything about either parent, but does state very plainly that he is an Indian of the half-blood."

Notwithstanding the fact that the Supreme Court has said that the roll properly interpreted, means that Yekcha was an Indian of the half-blood; and has said that the roll "neither names nor says anything about either parent, but does state very plainly that he is an Indian of the half-blood," counsel for appellant undertake to distinguish the holding of the court on the ground that in that case the mother, a Seminole, did not appear upon the Seminole roll, while in this case both parents do appear on some Indian roll. The court did not put the case on this distinction, but put it upon the broad language quoted. Moreover the distinction is met by another circumstance. Counsel for appellant contend that the Seminole roll is limited to Seminole blood. If this is correct, then the showing that Yekcha was a half-blood on the Seminole roll, means that he is half Seminole. Yekcha's census card disclosed his father was a Creek; and it was conceded that he was a full-blood Creek; the mathematical deduction is that his mother must have been a full-blood Seminole. But the Supreme Court did not so view it.

Appellant contends that the general intent of Congress in the removal of restrictions was to protect and safeguard the incompetent Indian from himself; that the act declares, in substance, that a ¾ blood Indian is incompetent; and that a ¾ blood Creek-Seminole Indian is just as incompetent as a ¾ blood pure Seminole; that there was no intention on the part of Congress to discriminate against Seminoles, nor to ignore other Indian blood in their veins. Roughly speaking, this is probably true, although there is no evidence that Congress did not know how the Seminole roll was made up. But Congress had other practical considerations in mind. If Congress were concerned alone with incompetency in fact, some intelligence test would have been more appropriate, for Indians, like whites, differ in mental stature, and some full-bloods are actually more competent than other half-bloods. But an intelligence test would be impracticable. If blood is to be the test of competency, actual Indian blood would be more accurate than blood as shown by the rolls or enrollment records, for it would eliminate mistakes in those records. But if actual blood was made the test, titles would be subject to extensive long-drawn out litigation to determine paternity and blood, illustrations of which are numerous. McKinney v. Black Panther Oil & Gas Co., (8 C. C. A.) 280 F. 486. That plan would not meet the test of practicability. Or, as originally proposed by the bill introduced, resort might have been had to all the enrollment records to determine blood. But, for reasons that seemed sound, Congress declined to do that, and made the approved roll the sole test. We cannot change it. And, after all, if the right to alienate is to be of value to the Indian, there must be some reasonably safe and simple method of ascertaining the right of the Indian to alienate. We are of the opinion that Judge Pollock, who has had wide experience in Indian litigation, correctly stated the real intent of Congress, and of the general understanding of that intent, when he said in Bell v. Cook (C. C.) 192 F. 597, 605 (cited with approval by the Supreme Court of the United States, in the Ferguson Case, supra):

"In carrying out this scheme of protection Congress, as it had the undoubted right to do, defined the word 'minor' as it did therein and referred any and all persons intending to become purchasers of any portion of the tribal property from an allottee thereof, not to the uncertain hazard of a

judicial inquiry based on the evidence of ignorant, incompetent and interested witnesses, but to the fixed and definite public rolls to ascertain whether such allottee did or did not possess the qualified age or requisite degree of Indian blood to confer on him the power of disposition under the law. If an intending purchaser from an allottee of tribal property holding the public rolls in one hand, and the act in the other, by a comparison of the two found such allottee possessed the power of disposition under the act and the rolls, he was at liberty to purchase and he was protected in such purchase. If, on the contrary, the law and the public rolls considered together denied the right of the allottee to convey, a purchaser from such allottee was not protected, and this regardless of the true state of facts as they might be made to appear in this case."

Appellant relies strongly on Gilcrease v. McCullough, 249 U. S. 178, 39 S. Ct. 198, 63 L. Ed. 547, and other cases in accord therewith. Those cases hold that the statement on the records that an Indian is 9 years old, means that he is in his tenth year; since the record does not purport to give age to the month or day, that proof may be received of the date of birth within the tenth year; that to show that an Indian is 9 years and 3 months old does not contradict the record which shows "Age 9." The cases are not in point. To prove that an Indian is a ¾ blood and restricted does contradict a roll which shows her to be a ¼ blood and unrestricted.

Finally, the court is asked to reform the Seminole roll created by Act of Congress and approved by the Secretary of the Interior. While we have grave doubts of the power of any court to alter this roll, it is sufficient now to say that we cannot enter an order reforming it as of twenty-odd years ago, and divest property rights which have attached in the interim on the strength of it. Nor can the patent issued to appellant be collaterally attacked. An allotment certificate, issued by the Dawes Commission, like a patent "is impervious to collateral attack." Wallace v. Adams (8 C. C. A.) 143 F. 716, 721, (opinion by Judge Walter H. Sanborn).

The power of Congress is plenary in the premises. The statute is susceptible, in our opinion, to no other construction save the one given to it by the public generally for twenty years, and that is, that the "rolls of citizenship and of freedmen of the Five Civilized Tribes approved by the Secretary of the Interior shall be conclusive evidence as to the quantum of Indian blood of any enrolled citizen or freedman of said tribes."

The decree is, therefore, affirmed.