**FOLK v. MONSELL et al.**
**No. 942.**

Circuit Court of Appeals, Tenth Circuit.
June 29, 1934.

Rehearing Denied Aug. 1, 1934.

Rutherford Brett and Rutherford H. Brett, both of Ardmore, Okl., for appellant.

C. B. Stuart, of Tulsa, Okl. (E. J. Doerner, of Tulsa, Okl., and P. P. Pinkerton, of Sand Springs, Okl., on the brief), for appellees.

Before LEWIS and BRATTON, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge.

The appellant, plaintiff below, in his complaint entitled "Bill in the Nature of a Bill of Review for Fraud," filed June 5, 1930, sought an order from the court below vacating its prior order of January 3, 1923, by which that court discharged and absolved Charles Page and the United States Fidelity and Guaranty Company from liability on two bonds executed by the former as principal and the latter as his surety.

The circumstances under which the two bonds were executed were as follows: The United States brought a suit in the court below to cancel a Creek Indian allotment to Thomas Atkins as a member of that tribe, who had died before that suit was instituted or shortly thereafter. Minnie Atkins was married to appellant in 1907. She claimed to be the mother of Thomas Atkins and his sole heir, and she had given an oil and gas lease to Charles Page. She, appellant and Charles Page were made defendants in that suit. One Nancy Atkins also claimed to be the mother of Thomas Atkins and his sole heir, and she was made a defendant. Others claiming an interest in the allotment were also made defendants. The District Court found in favor of Minnie; that the allotment was valid; that Thomas was deceased; and that Minnie was his sole heir. This was affirmed in United States v. Atkins et al. by the Circuit Court of Appeals of the Eighth Circuit. 268 F. 923. On appeal judgment below was again affirmed in United States v. Atkins, 260 U. S. 220, 43 S. Ct. 78, 67 L. Ed. 224. When the case was in the District Court it appointed a receiver of the leasehold estate. An appeal was taken from that order, and it was reversed and vacated, but to safeguard the

rights of litigants in the extraction of minerals by the lessee pending the litigation the appellate court ordered that Page, the lessee, give bond with surety for that purpose. The terms of the bond were set forth in its order. Folk et al. v. United States et al. (C. C. A.) 233 F. 177. The two bonds in the respective penal amounts of $900,000 and $50,000 contain the obligations assumed by the principal and surety from which the court's order of January 3, 1923, absolved them.

Minnie Folk, née Atkins, died testate May 24, 1919. She devised and bequeathed to her husband, appellant, two-thirds of all her property. She had assigned twenty per cent. of the royalties which she reserved in the lease to E. C. Hanford, an attorney, in consideration for which he was to represent her in said litigation. Appellant was therefore entitled to two-thirds of eighty per cent. of the royalties. He so alleges in his bill.

On the subject of fraud the bill alleges that Page was a man of strong mind and dominating personality; that he showed many kindnesses to appellant and his deceased wife; that appellant is a man of weak mind and no business experience; that they trusted Page with every detail of their affairs; that a confidential and fiduciary relation existed between Page and them; that Page and his employees kept the books which showed production of oil, and appellant had no access to them; and that Page used said fiduciary relations to overreach, cheat and defraud appellant, and falsely represented to and advised the court when it entered its order of January 3, 1923, that he had accounted to appellant for all that was due him, and thus obtained said order discharging said bonds. It is further alleged that appellant had no notice of the hearing on January 3, 1923; that his attorney, Hanford, did not have notice of said hearing and was not in Oklahoma on that day; that appellant was not represented at said hearing, knew nothing of it at the time, and did not learn of it until March 31, 1930; that on January 3, 1923, Page had not accounted to appellant for his share and interest in the royalties as it was his duty to do, nor has he or his representatives ever accounted therefor. Appellant thereupon prayed for an order of the court vacating its said order of January 3, 1923.

Appellees here are the executors of the estate of Charles Page, deceased, who died December 27, 1926, the United States Fidelity and Guaranty Company, the Sand Springs Home, a corporation to whom Page assigned the lease on September 22, 1917, E. C. Hanford, and two sons of Minnie Folk to each of whom she had bequeathed a one-sixth share of her interest in the royalties.

The executors of the Page estate, the United States Fidelity and Guaranty Company, and the Sand Springs Home joined in an answer. Their answer alleges, among other things, that appellant's petition for leave to file a bill of review for fraud stated that Charles Page, deceased, had obtained the signature of appellant to a purported bill of sale of all appellant's right, title and interest in and to the accumulated royalties in question herein, and that said signature and settlement were obtained by fraud. "In other words, the bill submitted upon the application for leave to file this bill, alleged a fraud practiced upon plaintiff (appellant) in obtaining a release and settlement, and the present bill ignores and omits the execution of said release and settlement, and alleges a fraud perpetrated upon the court in securing the order complained of." The answer denied all allegations of fraud contained in the bill; denied that appellant had no notice of the hearing on January 3, 1923, when the order complained of was entered; and denied that that order was obtained by fraud either upon the court or upon appellant. It alleges that appellant acted as executor of his deceased wife's estate, and that with full knowledge of all the facts he entered into a full and complete settlement with Charles Page of all his right, title and interest in the royalties and accepted therefor certain bonds and preferred stock, served as a director of the company that issued them, and made no complaint until conditions became such that the company was not operating at a substantial profit; that for said consideration and other considerations appellant executed and delivered to Page the release set up in plaintiff's original bill and assigned to Page his interest in the royalties under the oil and gas lease.

The answer as a further defense alleged that when the bonds were executed Page deposited with his surety on said bonds various stocks and bonds of the approximate value of $675,000 for its protection against liability thereon; that after the court's order of January 3, 1923, the surety, relying on the validity of that order, returned to Charles Page the stocks and bonds that had been so deposited with it, and that by reason thereof and the laches of appellant he is precluded and estopped to question the validity of said order; that if said order of January 3, 1923, is vacated it may suffer irreparable loss.

Appellant filed a reply to the answer in which it alleged that Charles Page controlled and directed the administration of Minnie Folk's estate; that he kept the books and directed every detail, caused false inventories to be made; that appellant had no access to the books and knew nothing about the condition of his wife's estate, but blindly followed the direction of Page, and that Page was in fact the executor while appellant and another were such only in name. He denied that he ever had a settlement with Page, but stated that Page "palmed off" on him certain first mortgage gold bonds on the cotton mill at Sand Springs, Oklahoma, and certain preferred stock in said mill, the face value of same aggregating $100,000, but alleged that they were worthless and known to be worthless by Page; that to cover up his fraud Page without appellant's knowledge furnished the money with which to pay appellant's accruing interest on the bonds, which he discovered after Page's death and was then told by Page's executors that the bonds and stock would not sell for more than thirty cents on the dollar. He denied that he ever signed a release of his interest in his wife's estate to Charles Page.

■ On the subject last referred to in the pleadings the proof shows and the court found that of date December 30, 1922, Folk for a recited consideration of $122,165.70 sold, conveyed and assigned to Charles Page all his right, claim and interest as legatee under the will of his wife in and to the oil and gas royalties accumulated and to be accumulated up to and including January 15, 1923. He acknowledged this document before a notary public. It was further shown and found by the court that Folk at a later date petitioned the probate court in which his deceased wife's estate was being administered for the approval of said settlement and assignment, and that Page be substituted in his stead as distributee of his portion of the royalties accumulated up to and including January 15, 1923, and the court later in May, 1923, acting on that petition, entered its order in compliance therewith. It found that Folk, petitioner, had received a full, fair and adequate consideration for said assignment to Charles Page; that his deed and transfer to Charles Page executed on December 30, 1922, "be and is hereby approved by this court; and that the said Charles Page be substituted as distributee in the place and stead of the said Harry B. Folk, legatee, of the said Harry B. Folk's portion of the oil and gas royalties accumulated from the above described real

estate up to and including January 15, 1923, and that said executors be and are hereby ordered to distribute to the said Charles Page all the interest of the said Harry B. Folk in the said oil and gas royalties accruing from said above described land, up to and including the 15th day of January, 1923." Under the statutes of Oklahoma that court had jurisdiction over the subject matter and the power to make that order. Compiled Oklahoma Statutes, 1921, § 1079. Goodrich v. Ferris, 214 U. S. 71, 29 S. Ct. 580, 53 L. Ed. 914; O'Connor v. Stanley (C. C. A.) 54 F.(2d) 20; Pitman v. Commissioner (C. C. A.) 64 F.(2d) 740; Teague v. Smith, 85 Okl. 12, 204 P. 439; Tucker v. Leonard, 76 Okl. 16, 183 P. 907; Pennington v. Woodner-McGaugh, 54 Okl. 110, 153 P. 875; Sjoli v. Hogenson, 19 N. D. 82, 122 N. W. 1008; Otis v. The Rio Grande, 1 Woods 279, Fed. Cas. No. 10,613; Foltz v. St. L. & S. F. Ry. Co. (C. C. A.) 60 F. 316.

■ It thus appears that the probate court found and adjudicated that appellant had no further interest in or right to the royalties that accrued under said lease prior to January 15, 1923, and that judgment until reversed or vacated by proper procedure in that court or in some other tribunal of the state authorized thereto by its laws must be accepted here, not only to estop appellant to be heard on his allegations of fraud, but as a bar against the maintenance and prosecution of that complaint in this court. Obviously the purpose of the bill, as shown by its prayer, was to obtain an order vacating the order of January 3, 1923. It omitted any reference to the settlement of royalties as between Folk and Page and the former's assignment thereof for a consideration to the latter on December 30, 1922, to Folk's petition that the probate court enter its order approving that settlement and assignment and the substitution of Page in his stead as being entitled thereto. But the defendants in their answer alleged that Folk in his tendered bill, filed with his petition for leave to exhibit, stated that Page had obtained Folk's signature to a purported bill of sale of all his rights and interest in the accumulated royalties. This seems to have brought from Folk the allegations in his so-called reply to the effect that Page had defrauded him out of those royalties. Then at the hearing the uncontradicted proof discloses that the settlement was made and, on the petition of Folk, approved by the probate court. This, as already said, constituted an adjudication that the part of the royalties accrued prior to Jan-

nuary 15, 1923, claimed by Folk should be paid to Page and that Folk had no further interest in them. Folk's attack on the validity of that proceeding in the probate court is therefore collateral and not direct. In I Freeman on Judgments (5th Ed.) the author in Sec. 305 states the rule of inhibition against collateral attack thus:

"Judgments of a legally organized judicial tribunal, proceeding within the scope of its allotted powers, and possessing the requisite jurisdiction over the subject matter of the suit and the parties thereto, whether correct or erroneous, cannot be called in question by the parties or privies in any collateral action or proceeding."

Sec. 306. "If instituted for the very purpose of setting aside, correcting or modifying the judgment, it is usually regarded as a direct attack; for the attack upon the judgment in such cases is not incidental to the object of the proceeding and the end of the proceeding is not something collateral to the judgment. If, on the other hand, the direct purpose and aim of the proceeding is to obtain some other relief than the vacation or setting aside of the judgment and the attack upon the judgment is merely incidentally involved, it will be considered a collateral attack, though relief from the judgment may also be necessary under the circumstances."

So also I Black on Judgments, § 252: .

"But if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack upon the judgment is collateral and falls within the rule."

■ The purpose and object of the bill, as said, was to obtain an annulment of the order of the federal court of January 3, 1923, and the attempt of appellant here to avoid the effect of the action of the probate court taken at his initiation was a collateral attack on those proceedings and can be given no effect. Moreover, because of lack of diversity of citizenship between necessary parties, Folk on the one side and Page's personal representatives on the other, the court below was without jurisdiction in any controversy between them over the validity or effect of Folk's assignment of the royalties and the action of the probate court thereon, even in a direct proceeding. They are all citizens and residents of Oklahoma. Geneva Furn. Co. v. Karpen, 238 U. S. 254, 35 S. Ct. 788, 59 L. Ed. 1295; Independent School Dist. v. Rew (C. C. A.) 111 F. 1, 55 L. R. A. 364; Tullar

& Tullar v. Ill. Cent. R. Co. (D. C.) 213 F. 280.

■ Again, a Federal court cannot annul and vacate the orders and judgment of a state court. No court other than the one that entered those orders and judgment can exercise that power. Wells Fargo & Co. v. Taylor, 254 U. S. 175, 184, 41 S. Ct. 93, 65 L. Ed. 205; In re Rochester Sanitarium & Baths Co. (C. C. A.) 222 F. 22; I Freeman on Judgments (5th Ed.) § 210; I Black on Judgments, § 297. A Federal court of equity can enjoin the execution of a judgment of a state court in a direct attack for fraud. Its injunctive order restrains the judgment creditor. Chicago, R. I. & P. Co. v. Callicotte (C. C. A.) 267 F. 799; III Freeman on Judgments (5th Ed.) § 1182. But here the orders and judgment of the probate court have been fully executed.

■ The bill alleges that the two bonds given by Page and the surety were conditioned that the former would faithfully account for all the royalties and profits that had accrued or might accrue between the 8th day of March, 1915, and until the final termination of said suit, to whomever might be finally adjudged the rightful owner of said royalties and profits. The word "royalties" is not used or to be found in the bonds or in the order of the Circuit Court of Appeals which directed the giving of them. The obligation, after stating the penal sums, continues thus: "to be paid to the said appellees, or whichever of the parties to this suit, that shall be finally adjudged to be entitled thereto. * * *" The defendants below, Minnie Folk et al., took that appeal. Nancy Atkins was made a defendant in that suit, because of her claim that she was the mother of Thomas Atkins, but her interests were, of course, adverse to the interests of Minnie Folk and Charles Page. The bond further recited that Charles Page as lessee of Minnie Folk,

"is in possession of the property in controversy and operating the same for oil and gas; and is now, and since the 8th day of March, 1915, has been receiving the proceeds derived from said operations; and is, and has been, charged with the costs and expenses of said operations, now therefore

"The conditions of this obligation are such that:

"If the said Charles Page shall account for and pay over to those parties to this suit that shall be finally adjudged to be entitled thereto, the profits that have been and shall be derived by him from the land in controversy between March 8, 1915, the date when

the receiver was appointed, and the final determination of this suit, * * * (and) to pay to the parties ultimately adjudged entitled thereto any damages resulting to them from the negligence or mismanagement of the property and to abide by and perform the further orders of this court and of the court below in the premises, then this obligation shall be void, otherwise the same shall be and remain in full force and virtue."

Clearly the bonds required an accounting from Page for what he might realize on oil and gas under the lease, less the cost and expenses of its operation. He could retain no profits. He could reimburse himself out of what he received for minerals only to the extent stated, the costs and expenses of operation. It thus seems apparent that the bonds were not given for the protection of Minnie Folk, the lessor, but for the claimants adverse to her, the United States and Nancy Atkins, in event they or either of them should be successful in the litigation. To apply the conditions to Minnie Folk and her assigns would have been to destroy the terms of her lease to Page, which reserved to her as royalties only one-eighth of the mineral produced, nor was she interested in the cost and expenses of operation. Page was to retain under the terms of the lease seven-eighths of the mineral produced as his property, regardless of what it might cost him to produce it.

■ Appellant further alleged in his bill that he had no notice of the hearing to be had on the petition to cancel the bonds on January 3, 1923, on which day that order was made; that his attorney, Hanford, had no notice of that hearing and was not in the state of Oklahoma on the date of said hearing; that appellant was not represented at that hearing and first learned of that order on March 31, 1930, in this way: that appellant sued the administrators of the estate of Charles Page in the district court of Tulsa county for the royalties and *profits* due him under the oil and gas lease; and that his attorneys in this suit in looking up the evidence to be used in that suit discovered the order of the court below of January 3, 1923, and they at once instituted this suit, informing appellant shortly before instituting it of the order of January 3, 1923. In the latter part of 1922 E. C. Hanford, appellant's attorney and the attorney for his wife prior to her death and who had represented them throughout the litigation, was stationed at Columbus, Ohio, in the United States military service. On November 17, 1922, he sent a letter to Page's agent, F. B. Long, at Tulsa, Oklahoma, in reference to the settlement of his interest and the interest of "Minnie's heirs." This was three days prior to the decision rendered by the Supreme Court in the case. In this letter he said:

"Wish I could confer with you as to the settlement of Minnie's heirs and my interest as quickly as possible after the decision is rendered in order to get an immediate dismissal of the bond. This is imperative in order to keep those people from starting a new tangle as they know the bond cannot be cancelled until the money is paid over to us and as long as that bond is up it is an enticement for them to keep hanging on. That is one reason I was so anxious for a dismissal as we could have consummated a final settlement so quickly."

Long replied by wire to the effect that they must wait thirty days after decision for the mandate. After further correspondence Hanford wired from Columbus, Ohio, December 27, 1922, that he was leaving that day. He arrived at Tulsa, Oklahoma, two or three days prior to the hearing. He telephoned the District Judge at Muskogee the day before the order of January 3, 1923, was entered and inquired about the matter. Judge Williams told him he would hear the matter the next morning in court. Hanford had ample time to reach Muskogee before court opened the next morning, but he remained in Tulsa the night of January 2d and did not start for nor reach Muskogee until the morning of January 3d. He had been with F. B. Long, Page's agent, at least part of the time while he was in Tulsa. Hanford testified that he had forgotten at what hour Judge Williams told him over the telephone the hearing would come on the morning of January 3d, but he thought it was at 9:00 or 10:00 o'clock; that he did not know the purpose of the application to be made to the court; that he was surprised to learn that the application was to be made; that he did not know whether he learned about it from F. B. Long; that on hearing about it while in Tulsa he called Judge Williams; that he reached Muskogee after 10:00 o'clock on January 3, 1923, and heard there that the order had been made and went no further; that he "realized he had been licked and blew up." It was admitted that on January 3, 1923, a train left Tulsa at 6:04 A. M. and arrived at Muskogee at 8:00 A. M. Hanford's testimony that he did not know prior to leaving Tulsa on the morning of January 3d the purpose of the application to be made to the court and was surprised that such an application was to be made, is hardly credible in view of his cor-

respondence with Long. He was anxious and urgent before the opinion of the Supreme Court was rendered that such an order be speedily obtained; and that, because he thought it necessary before he and "Minnie's heirs" could appropriately obtain from Page a settlement, and because he thought until the bonds were discharged they might induce others to set up claims. His correspondence with Long shows beyond question that his only purpose in coming to Oklahoma was to see that such an order was entered. He further testified that he saw appellant while in Oklahoma on that trip. There was testimony that Hanford was in the court room when the order under consideration was entered, and further testimony that immediately after the order was entered he was introduced to Judge Williams in his chambers. Hanford denies this. The court found that he was present in court when the order was under consideration. He claims, and so testified, that when he heard at the hotel that the order had been made he remained there and did not go to court. He seems to have been busy while in Muskogee settling the balance of the amount due him out of the twenty per cent. royalties assigned to him by Minnie Folk for his services, and he received pursuant to that settlement in addition to sums theretofore paid him a little more than $60,000.

Folk in his testimony did not deny that he saw Hanford on his trip to Oklahoma during the latter part of December, 1922, and the early part of January, 1923, notwithstanding he stated under oath in his bill in reference to the court's order of January 3, 1923: "Your petitioner would further show that he had no notice of said hearing; that his attorney, E. C. Hanford, had no notice of said hearing, and was not in the state on the date of said hearing. * ⁓ ⁂ " He testified that he understood the English language and wrote it. He admitted his signatures to the instrument assigning his royalties to Page and his petition to the probate court that Page be substituted in his stead as distributee of the royalties that had belonged to him, but testified that he never read them; that he signed everything that Page asked him to sign. Is it an unreasonable deduction from the facts and circumstances: That Folk and Hanford both knew that Folk had assigned his interest in the royalties to Page and was bound by that assignment; therefore Folk felt unconcerned about the application for the order of January 3, 1923; and that Hanford with that knowledge was concerned only in getting the balance due him under his twenty per cent. contract with Folk's wife, which balance was adjusted and agreed upon with Long at the hotel in Muskogee on January 3, 1923, and for that balance he received a check before leaving Oklahoma? We think not.

We are of opinion also that the plea of laches and estoppel in favor of the surety was well taken and is sustained by the undisputed facts.

The order dismissing the bill is affirmed.