**GORMAN et al. v. SHAFFER OIL & REFINING CO. et al.**

No. 1083.

Circuit Court of Appeals, Tenth Circuit.

Dec. 28, 1934.

Glenn Alcorn and R. W. Raynolds, both of Tulsa, Okl. (A. S. Wells, of Wewoka, Okl., Bob Howe, and Chal Wheeler, on the brief), for appellants.

Hubert. Ambrister, of Tulsa, Okl. (W. H. Francis and A. S. Hardwicke, both of Dallas, Tex., and B. B. Blakeney and W. R. Wallace, both of Oklahoma City, Okl., on the brief), for appellee Magnolia Petroleum Co.

Alger Melton, of Chickasha, Okl., for appellees Cutlip and Horsley.

J. H. Maxey, of Tulsa, Okl. (Gibson, Maxey & Holleman, of Tulsa, Okl., on the brief), for appellee Blakeney.

Robert M. Rainey, of Oklahoma City, Okl. (W. F. Semple, of Tulsa, Okl., and Rainey, Flynn, Green & Anderson, of Oklahoma City, Okl., on the brief), for Deep Rock Oil Corporation, successor eo nomine to Shaffer Co.

Before LEWIS and PHILLIPS, Circuit Judges, and JOHNSON, District Judge.

LEWIS, Circuit Judge.

On March 20, 1923, Tal Jones, plaintiff below, gave an oil and gas lease to Shaffer Oil & Refining Company, a Delaware corporation, on land in Seminole county, Oklahoma, described as follows: Lot Two (2) and Lot Three (3) less 20 acres for graveyard of Section 32, Township 8, Range 8, and containing 40.57 acres more or less. Oil was discovered by the lessee in September, 1924. In 1929 this suit was instituted by Jones in the state district court in said county, which was removed to the court below. His original petition is not in the record. After removal he filed an amended petition

containing four counts. In addition to jurisdictional facts it is alleged that plaintiff gave said lease reserving one-eighth of the mineral to be produced as royalty; that he was the owner of one-half of said royalty interest from the time oil was discovered in September, 1924, till March 5, 1925; that during that time large amounts of oil had been taken from said land; that the exact amount of accumulated oil runs were not ascertainable by him; that one-half of the royalty interest was his property; that he had not sold or transferred said interest in the oil runs from September 27, 1924, to March 5, 1925; that he did execute a quit claim deed to the land on March 5, 1925; that the original defendant, and Magnolia Petroleum Company, a foreign corporation, and B. B. Blakeney, the latter two being made defendants after the suit was removed, had withheld his interests in the reserved royalties and converted it to their own use; that he was informed and believed that their withholding was because of purported transfers from him to Blakeney of his royalty interest, which transfer orders were forgeries and a scheme and trick to defraud him out of his property; that he had never received anything for said transfer orders, although he was the owner of half of the royalty interest reserved in said lease. He prayed judgment for the amount thereof.

In a second count he prayed for an accounting to ascertain the amount of his interest claimed to have been withheld from him and that a receiver be appointed. In a third count he prayed damages in the sum of $5,000 for the withholding of his said royalty interest. In a fourth count he again alleged that the purported transfers of his interests in said withheld royalties were forgeries; that he had received no consideration therefor, and that the only consideration that had been received by him was the sum of $20,000 for a quit claim deed of date March 5, 1925, and asked judgment for cancellation of said purported transfer orders.

The suit was then transferred to the equity side, and plaintiff was given time to recast his pleadings. He then filed an amended petition containing four counts, which are in substance the same as the four counts in his preceding petition. There were no material changes or additions. With leave of court he then filed another amended petition the first paragraph of which is this: Plaintiff "reiterates and realleges all of the material allegations contained in his original petition and amended petitions in as full and complete a manner as if set out verbatim. * * *." He then alleges that he had seen the purported transfer orders directed to the two defendant companies, and they were forgeries; that he had been defrauded out of his property by means of fraud and collusion on the part of the defendants; that his knowledge of the fraud had been recently obtained; that at the time he executed the quit claim deed to the land covered by the lease he only received $20,000, and at that time there was $45,000 or more due the various royalty owners, and he was the owner of half thereof; that he never received any consideration for the purported transfer orders, which he never executed; and he prayed that the transfer orders and all other instruments tending to deprive him of his property be cancelled, and that he have such other and further relief as might seem equitable.

By supplemental bill the plaintiff sought recovery not only of the royalties withheld from him up to March 5, 1925, but half of the royalties accruing thereafter, and that title in him to the land leased be quieted as against the defendants. Plaintiff verified the facts stated in his pleadings on oath.

The defendants by answers denied the allegations of the plaintiff's petitions generally and in detail. In the answer of defendant Blakeney it is alleged that by a transaction between him and plaintiff on March 5, 1925, through others, he purchased from plaintiff the leased lands and impounded royalties in consideration of $20,000 paid by him to plaintiff; that at the time he made the purchase one Mary Perryman claimed to be the owner of the land and had instituted an action in the state district court for Seminole county for the purpose of recovering the same; that one or more other suits by other parties claiming ownership in the land had been instituted against plaintiff; that plaintiff represented that he was being harassed and annoyed by these claims and suits which prevented him from receiving his claimed half of the royalty interest; that he wished to convert his interest therein into cash and be rid of the vexatious litigation and annoyance that it caused him; that he so informed his attorneys at Wewoka of his intentions, and these representations were made to Blakeney through them.

It appeared in evidence conclusively, we think, that plaintiff was trying to negotiate

a sale of all his interest to another party for the sum of $16,000. He so informed Cutlip and Horsley, his attorneys at Wewoka. They undertook to convince him that he should not sell; they told him it was their opinion he would be successful in the litigation that had been instituted against him and in additional litigation that was threatened; that if he insisted on selling he should get more; that if he would wait they would make an effort to get him more than $16,000; that his interest was worth more. They further testified that they had him bring his two sons to their office in their effort to persuade him not to sell. The sons came with the plaintiff, but the plaintiff in their presence insisted that he wanted to sell. The sons were not called by plaintiffs to deny this. Horsley went to Oklahoma City where he met Blakeney who then had a small interest in the royalties withheld. After negotiations Blakeney agreed to pay plaintiff $20,000 for the land and his half interest in royalties, Blakeney to assume certain obligations of plaintiff to his attorneys. Cutlip prepared the necessary papers. He drew a contract between plaintiff and Blakeney setting forth the terms of sale. Plaintiff signed the contract, a quit claim deed conveying the land to Blakeney, and assignments to Blakeney of plaintiff's interest in the royalties held in part by the Magnolia Petroleum Company and in part by the Shaffer Oil and Refining Company. These documents were acknowledged before a notary public by the plaintiff. Plaintiff had a written contract with Cutlip and Horsley by which he engaged them to defend pending and threatened suits attacking his title, and if they should be successful he was to give them a deed to one-fourth of the mineral rights in the land for their services. Blakeney assumed plaintiff's obligations to Cutlip and Horsley. After said documents were executed Horsley delivered to plaintiff Blakeney's check for $20,000, went to the bank with plaintiff where it was deposited to plaintiff's credit, and with its proceeds plaintiff immediately purchased United States bonds. Mr. Cutlip testified that he dictated the instruments just referred to in plaintiff's presence. The evidence is convincing that no fraud or overreaching or deception was practiced on the plaintiff in the transaction with Blakeney. Blakeney had never met the plaintiff until after the transaction was closed through Horsley. The District Judge in his memorandum and findings of fact said:

"There was no fraud or overreaching on the part of the defendant, B. B. Blakeney, nor was there any collusion between Cutlip and Horsley and Blakeney in the transaction."

■ He said there was not even a fair degree of suspicion.

"Plaintiff evidently thought that, regardless of the advice of his attorneys, a net cash sale of $20,000.00 was worth more to him under the circumstances than continued worry and trouble over the defence of the various lawsuits pending and threatened. * * *"

The findings of a Chancellor are presumptively correct [Standard Oil Co. of Colo. v. Standard Oil Co. (C. C. A.) 72 F. (2d) 524, 527, and cases there cited], and our examination of the record convinces that he did not err as to the facts or law.

■ A few words about plaintiff's title. The land included in the lease had been allotted to James Perryman, a full blood Seminole Indian. Plaintiff claimed as Perryman's devisee. Perryman was supposed to have died testate. His will is not in the record, and there is no proof that it was ever proved and established in the court of probate jurisdiction. Impliedly it is conceded that it was not so established. His widow Mary is a full blood Creek Indian. In one of the suits collateral Seminole heirs to James Perryman claimed that he died before statehood; that because thereof his widow, being a full blood Creek Indian, was not his heir; and that the land descended to the nearest Seminole heirs. Oklahoma was admitted as a state November 16, 1907. James Perryman was not living at home at the time of his death. He left surviving his wife Mary and one child Benjamin, who was born after the execution of the claimed will, and Benjamin died on or about February 1, 1909, leaving surviving him his mother Mary. Mary executed a deed conveying the land in controversy to Tal Jones on August 26, 1909, but the deed was not approved by the county judge, as the statutes required it should be to render it valid, until many years after its execution. Thereafter, July 24, 1915, Mary Perryman executed another deed to Tal Jones, properly approved, conveying the land less twenty acres occupied as Oakwood Cemetery. The grounds on which she, in her suit against plaintiff, repudiated her conveyances are not disclosed in this suit. Blakeney, after he purchased, settled all the litigation against Tal Jones

involving title at a cost to him of about $7,000. Thereafter in 1925 Blakeney brought a suit against Mary Perryman and others in the state district court of Seminole county to quiet his title. Tal Jones was made party defendant to that suit, and he filed a disclaimer, signed by himself, to any interest in the property. In the decree in that case the court found and adjudged that Blakeney was the owner in fee of both of said lots except 4.04 acres that was included in an Indian allotment to one Betty Lena. That 4.04 acres lies across the south end of said Lot 3, and is a strip 165 feet in width. The District Court over objections permitted the city of Wewoka in Seminole county to intervene as a party on its petition stating that in 1909 it brought a condemnation suit against Tal Jones and others to condemn twenty acres of said Lot 3 for cemetery purposes; that by error the 4.04 acres allotted to Betty Lena was included as part of the twenty acres; that the error was caused by beginning the survey for the cemetery plot at the southwest corner of said Lot 3 instead of 165 feet north of said corner, and it asked the court below to reform and correct the decree of condemnation of the state court by excluding the Betty Lena 4.04 acres, and by including 4.04 acres on the north side of said condemned plot. Of course, a federal court has no jurisdiction to grant such relief. Folk v. Monsell (C. C. A.) 71 F.(2d) 816, 819. The trial court did not grant the relief sought. It should have dismissed the petition, in fact, refused intervention on the ground stated and also on the ground that it presented a controversy not germane to the suit pending.

The decree dismissing plaintiff's bill of complaint, including all supplements and amendments thereto, with prejudice is affirmed.