**TAYLOR v. TAYRIEN et al.**

No. 414.

Circuit Court of Appeals, Tenth Circuit.

Aug. 3, 1931.

See, also, 51 F.(2d) 892.

L. M. Poe, E. J. Lundy, R. E. Morgan, and H. R. Duncan, all of Tulsa, Okl., for appellant.

T. J. Leahy, C. S. Macdonald, F. W. Files, H. C. Hargis, F. O. Yarbrough, and Louis N. Stivers, all of Pawhuska, Okl., and L. H. Taylor, of Skiatook, Okl., for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

A single but important question is presented: Does the "headright" of an Osage Indian of less than half-blood, with a certificate of competency, pass to his trustee in bankruptcy? Judge Kennamer, in this case, held it did not; Judge Vaught, of the Western District of Oklahoma, held it did not. In re Denison, 38 F.(2d) 662.

By sections 1 and 2 of the underlying Osage Act (Act of June 28, 1906, 34 Stat. 539) the roll of the tribe was established, and each member was declared to be entitled to an equal share of "the tribal lands and tribal funds"; provision was made for the allotment to each member of a "homestead" of 160 acres, and a "surplus" allotment of about 500 acres. Section 2 (7) provides that the Secretary of the Interior, may, upon request, issue to any adult member of the tribe "a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this Act, except his homestead, * * * and provided further, that nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years,

886

and the royalty to be paid to said tribe as hereinafter provided; and provided further, that the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said twenty-five years, unless otherwise provided for by Act of Congress." (This 25-year period has now been extended until April 8, 1958. Act of March 2, 1929, 45 Stat. 1478.)

Section 3 provides that the minerals are "reserved to the Osage tribe for a period of twenty-five years"; that mineral leases shall be made by the tribe through its tribal council and approved by the Secretary of the Interior, the royalties to be determined by the President of the United States. Section 4 of the act provides that the tribal funds, then existing or thereafter accruing, shall be held in trust by the United States for twenty-five years; that such funds should be promptly segregated and placed to the credit of the individual members of the tribe, or to their heirs, and that the interest on such tribal funds shall be paid quarterly to the members of the tribe. Mineral royalties were to be placed in the Treasury of the United States "to the credit of the members of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this Act," and after deducting sums fixed by the act for the support of certain schools and for agency purposes, were to be distributed in the same way as interest on other moneys held in trust. The right of Osage Indians in these funds and to participate in these distributions is called a "headright."

Section 6 provides that "the lands, moneys, and mineral interests" of any deceased member shall descend to his heirs, with the restriction that if he die without spouse or issue, his mother and father shall inherit equally.

The Referee in Bankruptcy made an order directing the bankrupt to turn over all moneys or checks or orders received from such headright both before and since the filing of the petition in bankruptcy; and that he execute such instruments as might be necessary to enable the trustee to collect from the Secretary of the Interior any such sums that might be payable to the bankrupt at any time in the future. It is stipulated however that there were no quarterly annuity payments to the credit of the bankrupt at the time of his adjudication, but that since the adjudication "there have accumulated and will accrue in the future from said Osage headrights quarterly annuity payments."

The single question presented here, then, is whether the trustee may appropriate and sell, as an asset of the estate, the right of this bankrupt Osage Indian to receive such payments as may be passed to his credit from now until 1959, or until such date as Congress may by future legislation fix for termination of the trust period.

The position of appellant is that these headrights are transferable by Indians of the class of the bankrupt, and therefore pass to the trustee in bankruptcy under section 70a (5) of the Bankruptcy Act, 11 USCA § 110 (a) (5); that, if this be not so, it is nevertheless property which may be levied upon under judicial process, as provided by the same section. We are cited to authorities holding that equitable or beneficial interests of a bankrupt pass to the trustee, which is a field we find it unnecessary to explore. It is contended that, as to half-bloods with certificates of competency, the trust is a "dry" one, in that the trustee has no active duties of management or control. This is not true as to the "tribal trust"; the act places upon the trustee the very important and active duties of fixing the royalties for the mineral leases, and approving of their terms, and of collecting the royalties and distributing them, partly to the maintenance of schools, partly for agency and emergency purposes, and partly to the credit of the members of the tribe. In the reply brief, appellant states that "this proceeding involves only the status of the fund after it is divided and placed to the credit of the bankrupts ready for delivery to them, or after it has been delivered to them." But it is stipulated that at the time of the adjudication there was no money due the bankrupt; and if the bankrupt's right attached after the adjudication, then it does not pass to the trustee under the Bankruptcy Act. What the appellant is undertaking to reach is the bankrupt's inchoate right hereafter to share in the proceeds of oil now in the ground, and which is now the property of the tribe. To put it concretely: In 1945 the tribal council executes a mineral lease, approved by the Secretary of the Interior, for a royalty determined by the President; in 1946 royalties therefrom are placed in the United States Treasury; out of them are paid certain fixed charges; the balance is divided, and a share credited to the bankrupt or his heirs. Must the United States in 1946, pay this to appellant or his assignee?

The answer to the question must be found in the acts of Congress. If, in the process of emancipation, Congress has not made these

headrights transferable, they do not pass to the trustee in bankruptcy, for it would thwart the purpose of Congress to permit them to be indirectly transferred by the expedient of a debt followed by judicial sale. Mr. Justice Brewer, in Goudy v. Meath, 203 U. S. 146, 149, 27 S. Ct. 48, 50, 51 L. Ed. 130, held that "the purpose of the restriction upon voluntary alienation is protection of the Indian from the cunning and rapacity of his white neighbors," and that while Congress had the power to permit voluntary alienation and withhold the land from involuntary alienation, such a purpose must be clearly manifest. If, for the protection of the Indian, Congress has withheld the power of alienating his headright, then there is no power to alienate it by judicial process; for that would be to permit the "white neighbor" to accomplish indirectly what the law forbade him to do directly—to acquire the headright which Congress proposed to preserve for the care and support of its Indian wards. We proceed to the underlying question—Are Osage headrights transferable?

In dealing with Indian questions, it must be remembered that the powers of Congress are plenary. Stephens v. Cherokee Nation, 174 U. S. 445, 19 S. Ct. 722, 43 L. Ed. 1041; Cherokee Nation v. Hitchcock, 187 U. S. 294, 23 S. Ct. 115, 47 L. Ed. 183; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 S. Ct. 216, 47 L. Ed. 299; Gritts v. Fisher, 224 U. S. 640, 32 S. Ct. 580, 56 L. Ed. 928; Cully v. Mitchell (C. C. A. 10) 37 F.(2d) 493, certiorari denied 281 U. S. 740, 50 S. Ct. 347, 74 L. Ed. 1154. Congress has the power to reimpose restrictions on property once freed. McCurdy v. United States, 246 U. S. 263, 38 S. Ct. 289, 291, 62 L. Ed. 706. The breadth of the powers exercised under this plenary authority is well illustrated by the various amendments to the original Osage Act. The termination of the trust has been postponed from 1931 to 1959. The original act did not limit the amount of quarterly payments unless they were being dissipated (Work v. Mosier, 261 U. S. 352, 360, 43 S. Ct. 389, 67 L. Ed. 693); later acts imposed a limit. Act of March 3, 1921, 41 Stat. 1249. The statute now provides for revocation of certificates of competency as to certain Indians (section 4, Act of February 27, 1925, 43 Stat. 1008 [25 USCA § 331 note]); the power exists to revoke as to all. Congress regulates the transfer of land by inheritance or will. It grants or denies to the states the right of taxation. If Congress has withheld the power to alienate headrights, it is an end of the matter.

Prior to the original act of 1906 the title to the lands and funds of the Osages was in the tribe. The 1906 act was passed because of the belief of Congress "that in order to prepare the Indian for complete independence, he must be educated in self-control, and that this could best be done by committing to him gradually the care of his property." McCurdy v. United States, supra.

The 1906 act made no allotment of the mineral estate in the land; it remained tribal property. The individual Indian had only an inchoate right to receive his share of the net returns therefrom, subject to the will of Congress. It is entirely clear that under the 1906 act no Indian had any right to dispose of any mineral interests. The only right of alienation was the right to dispose of the "surplus" allotment, granted to an Indian holding a certificate of competency. Such a certificate has nothing to do with mineral rights. The statute defines the certificate as an authority to convey surplus lands; the section authorizing such certificates provides that nothing therein shall authorize the sale of the minerals. Appellant sets out in his brief the form of these certificates in use, which expressly excepts minerals from the authority thereby granted to sell his surplus lands. If there is authority to transfer these headrights, it must be found in later acts.

The Act of April 18, 1912 (37 Stat. 86), amplified the 1906 act in certain particulars. Section 4 thereof provided that "nothing herein shall be construed as in any way changing the rights of the Osage Tribe" in the minerals, or as amending the provisions of the 1906 act in regard to minerals. Section 6 concerns partition of allotted lands by the heirs of an allottee, and provides that when the heirs of deceased allottees are not members of the tribe, that restrictions on alienation are removed. Section 7 provides in part: "That the lands allotted to members of the Osage tribe shall not in any manner whatsoever be encumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency, or removal of restrictions on alienation; nor shall the lands or funds of Osage tribal members be subject to any claim against the same arising prior to grant of a certificate of competency. That no lands or moneys inherited from Osage allottees shall be subject to or be taken or sold to secure the payment of any indebtedness incurred by such heir prior to the time such lands and moneys are turned over to such heirs. * * *" Section 8 provides that

an adult Osage, not mentally incompetent, may dispose of his estate, including trust funds, by will approved by the Secretary of the Interior.

█ The Act of March 3, 1921 (41 Stat. 1249), amends the 1906 act by extending the reservation of the minerals to the tribe from 1931 to 1946. Section 3 provides in part: "That all members of the Osage Tribe of Indians are hereby declared to be citizens of the United States, but this shall not affect their interest in tribal property or the control of the United States over such property as is now or may hereafter be provided by law, and all restrictions against alienation of their allotment selections, both surplus and homestead, of all adult Osage Indians of less than one-half Indian blood, are hereby removed. * * * "

This section is strongly relied upon by appellant. But the grant of citizenship has no bearing; not only does the section expressly say that it does not "affect their interest in tribal property or the control of the United States over such property," but the Supreme Court of the United States has decided that "It has been frequently held by this court that the grant of citizenship is not inconsistent with the right of Congress to continue to exercise this authority by legislation deemed adequate to that end." Brader v. James, 246 U. S. 88, 96, 38 S. Ct. 285, 287, 62 L. Ed. 591. Neither does that part of the section removing restrictions as to Indians of less than half-blood, have any bearing. That part of the section does just what it says—removes restrictions as to the homestead and surplus allotments.

Section 4 amends the 1906 statute by limiting the amount of the quarterly payments of adults not having certificates of competency, and of minors, and provides for the investment of the excess. The section concludes: "That all just existing individual obligations of adults not having certificates of competency outstanding upon the passage of this Act, when approved by the Superintendent of the Osage Agency, shall be paid out of the money of such individual as the same may be placed to his credit in addition to the quarterly allowance provided for herein."

The purpose of this proviso seems to be clear. Prior to the enactment of this section, Indians without certificates were receiving large quarterly payments, which, when received by them, were available to pay their debts. Undoubtedly tradesmen had extended credit on the assumption that the Indian would continue to receive these large sums.

Congress cut these payments to $1,000 a quarter, and to avoid injustice to those who had relied on the old law, provided that just and "existing" obligations should be paid out of the excess, upon the approval of the superintendent. It is only by a stretch of the imagination that this proviso can be contorted into a congressional authority for a member of the tribe to alienate tribal property.

Appellant argues that this entire act, read as a whole, indicates an intention on the part of Congress to "put at an end the Individual Trusts of Osage Allottees of less than half-blood." We do not see it. The statute, instead of ending the tribal trust, extended it to 1946; and it further provided that the Secretary "shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter." This provision is utterly at variance with the contention of appellant that the 1921 act entirely emancipated Indians of less than half-blood. Appellant concedes that his position is squarely opposed to the decision of the Eighth Circuit in Osage County Motor Co. v. United States, 33 F. (2d) 21, 22, where it was held that promissory notes given by an adult Osage of less than half-blood were not valid unless approved by the Secretary of the Interior. That court held that the 1921 act did not fully emancipate such Indians, and that it did not make them "competent for all purposes, or to free them entirely from governmental control as to their persons or property." Certiorari was applied for and denied. 280 U. S. 577, 50 S. Ct. 31, 74 L. Ed. 628.

On April 12, 1924, Congress passed an act (43 Stat. 94) which is of great significance. It is the first and last statute that deals with the sale of headrights. We quote the entire statute, italicizing the significant words: "That any right to or interest in the lands, money, or mineral interests, as provided in the Act of Congress approved June 28, 1906 (Thirty-fourth Statutes at Large, page 539), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' and in Acts amendatory thereof and supplemental thereto, vested in, determined, or adjudged to be the right or property of any person *not an Indian by blood*, may with the approval of the Secretary of the Interior and not other-

wise be sold, assigned, and transferred under such rules and regulations as the Secretary of the Interior may prescribe."

The Act of February 27, 1925 (43 Stat. 1008 [25 USCA. § 331 note]), amended section 4 of the Act of March 3, 1921 (41 Stat. 1250), in respect to quarterly payments to adults not having certificates of competency, and to the guardians of the mentally incompetent. Like the 1921 act it protects those who had extended credit on the faith of the old law by providing, "Any indebtedness heretofore lawfully incurred by guardians shall be paid out of the funds of the members for whom such indebtedness was incurred by the Secretary of the Interior." Section 1.

Sections 2 and 3 of that act control the disposition of lands and funds passing at death. Section 4 provides for the revocation of certificates of competency for cause, but again protects creditors by providing that just indebtedness existing at the time of the revocation of the certificate shall be paid by the Secretary. This section does not apply to half-bloods or less, although the power exists in Congress to revoke as to them.

Section 6 provides: "No contract for debt hereafter made with a member of the Osage Tribe of Indians not having a certificate of competency, shall have any validity, unless approved by the Secretary of the Interior. In addition to the payment of funds heretofore authorized, the Secretary of the Interior is hereby authorized in his discretion to pay, out of the funds of a member of the Osage Tribe not having a certificate of competency, any indebtedness heretofore or hereafter incurred by such member by reason of his unlawful acts of carelessness or negligence."

Section 7 provides: "Hereafter none but heirs of Indian blood shall inherit from those who are of one-half or more Indian blood of the Osage Tribe of Indians any right, title, or interest to any restricted lands, moneys, or mineral interests of the Osage Tribe: Provided, That this section shall not apply to spouses under existing marriages."

This section does not apply to Indians of the class of the bankrupt, but Congress may, at any time, cut off or abridge the right of descent of Indians of his class.

The last statute is that of March 2, 1929 (45 Stat. 1478). Section 1 extends the reservation of minerals to the tribe until April 8, 1958, and again provides that all royalties and bonuses arising from the minerals "shall belong to the Osage Tribe of Indians, and shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law, after reserving such amounts as are now or may hereafter be authorized by Congress for specific purposes." The trusteeship of the United States is extended to January 1, 1959. Section 3 directs the Secretary to pay, within ten years, to all Osages of less than half-blood "all of the balance appearing to his credit of accumulated funds, and shall issue to such Indian a certificate of competency." Section 4 directs the Secretary, upon the death of an Osage of less than half-blood, to pay the "moneys and funds and other property accrued and accruing to his or her credit," to his administrator or executor. Section 5 provides that the debts of Osages of less than half-blood need not be approved by the Secretary. The section concludes: "That the Osage lands and funds and any other property which has heretofore or which may hereafter be held in trust or under supervision of the United States for such Osage Indians of less than one-half degree Indian blood not having a certificate of competency shall not be subject to forced sale to satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency. * * *"

This proviso, taken from its setting, carries an inference that trust funds may be subjected to forced sale to satisfy debts contracted after a certificate was issued. Read with its context, however, it seems to be but another savings clause; the section removed Osages of less than half-blood from section 6 of the 1925 act, which required the approval of the Secretary to give validity to debts of any Osage without a certificate. The proviso undertook to prevent the section from a retroactive operation, by providing in substance that debts which were invalid when contracted should not be the basis for a judicial sale.

Section 6 of the 1929 act provides: "All just existing obligations of restricted Osage Indians outstanding January 1, 1929, when approved by the Superintendent of the Osage Agency, shall be paid out of the money of such Indian appearing to his credit, in addition to his quarterly allowances. * * *"

While there may be room for interpretation in some of these statutes, a survey of all of the acts clearly shows: (a) Congress has not relinquished control over any Osage, no matter his degree of blood. The last act passed deals with the rights of those of less than half-blood in at least two particulars. (b) Neither has the tribe, nor Congress, relinquished control over the minerals. The

last act passed reaffirms and extends the title of the tribe thereto and expressly says that the royalties and bonuses "shall belong" to the tribe. (c) Neither has Congress abdicated its power over the individual property of the allottee. The last act passed exempts allotted property from taxation, controls the disposition of the property of a deceased Indian, and legislates as to the debts of members of the tribe. The 1925 act abridged the descent of lands and money of certain members of the tribe.

█ It is also plain that while Congress has found apt words to free from restrictions the surplus allotments of some Indians and the homesteads of others, it has refrained from the use of any such language as to headrights, except in the one case of non-Indian owners, and then only with the approval of the Secretary. When we start with a situation where no one of these classes of property— surplus, homestead, and headrights—is alienable, and where by the gradual process of legislation, first one class (surplus) is freed from restrictions in the hands of certain tribal members; and later another class (homesteads) is freed in the hands of other members; and still later the third class (headrights) is freed in the hands of non-Indians; in such a situation it seems impossible to say that Congress intended the third class to be alienable by any other person than the non-Indians specifically covered. Moreover, it has long been the policy of this government to construe statutory language in favor of the Indians. In Choate v. Trapp, 224 U. S. 665, 675, 32 S. Ct. 565, 569, 56 L. Ed. 941, the court said: "But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith."

Again reading the statutes as a whole, we are impressed with the idea that Congress intended to preserve these mineral rights as a last bulwark against the improvidence of the Indian. The idea in reserving the minerals to the tribe was doubtless a double one; it tended to equalize the allotments to the individuals, and it preserved intact a source to which the Indian who had squandered his allotment, might look for sustenance. In 1906 it was thought the Osages would be ready for complete emancipation by 1931; as that year drew near, it was seen that he was not yet ready to hold his own; the period has been twice extended for his protection. The Supreme Court of the United States has used language which, while not directed to the point here involved, is carefully chosen and discloses beyond a doubt its idea that these headrights cannot be taken for debts. The court was dealing with section 5 of the act of 1912, which provides that the Secretary may pay to Osage allottees, including the blind, the crippled and the aged, all of the funds to his credit, and after stating that the policy of the government was to educate the Osages by gradually giving them control over property, and that such policy was attendant by some risk, the court said: "But in the case of the Osages the risk was not attended by serious danger. Even if the whole trust fund should be released and, despite supervision, improvidently spent, the legally competent allottee would still have his homestead and his share in valuable undivided oil, gas and coal rights; and the legally incompetent, his surplus lands in addition." McCurdy v. United States, 246 U. S. 263, 269–270, 38 S. Ct. 289, 291, 62 L. Ed. 706.

That case was decided March 4, 1918. There has been no legislation since that indicates an intention on the part of Congress— except as to non-Indians—that the inchoate interest of an Osage in the mineral rights of his tribe, may be sold by him or taken for his debts. Other practical considerations suggest themselves. The bankruptcy law aims at an expeditious distribution of assets and closing of the estate. It would not be in accord with that aim to keep these estates open until 1959 so that the trustee might receive these payments. The alternative is to offer them at a bankrupt sale. But with the power existent in Congress to increase the charges against the fund, to decrease the quarterly payments, to re-impose restrictions, to curtail the right of descent, the present commuted value of a headright would be so speculative that this birthright of the Osage would doubtless pass under the hammer for a mess of pottage. Judge Parker, speaking for the Fourth Circuit, held in Suskin & Berry v. Rumley, 37 F.(2d) 304, 68 A. L. R. 768, that the speculative nature of the right weighed strongly in the balance in determining whether a contingent interest passed to the trustee in bankruptcy. But these considerations are for the legislative branch; whether it would be good public policy to enable the Osage to squander this last vestige of his inheritance, and to throw him back on the government for

his food and raiment, is for Congress and not the courts.

■ Before the trustee can appropriate this headright, it must be established that the bankrupt, at the time of the adjudication, had a property interest in the minerals and funds reserved to the tribe. An inchoate interest, an expectancy or possibility, does not pass. Remington on Bankruptcy, §§ 1199, 1200. The right of the bankrupt ultimately to share in the distribution of these properties is dependent upon the will of Congress; death may intervene between now and 1959; and the right to control descent, either with or without a will, has been exercised by Congress, and may be further exercised. Without undertaking precise definition, we are of the opinion that an Osage Indian has no present property right in the properties now owned by his tribe.

■ But if these considerations leave the question still in doubt, the administrative interpretations of the acts determine the matter. It has been ten years since the Osages were made citizens, and since those of less than half-blood were freed of restrictions as to homestead and surplus. There are 2229 Osage allottees. Many of them have become indebted; many of them must have desired to alienate their headright. Chief Justice Taft, in United States v. Jackson, 280 U. S. 183, 193, 50 S. Ct. 143, 146, 74 L. Ed. 361, in speaking of the construction of Indian laws, said: "It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. United States v. Cerecedo Hermanos y Compania, 209 U. S. 337, 28 S. Ct. 532, 52 L. Ed. 821; Robertson v. Downing, 127 U. S. 607, 8 S. Ct. 1328, 32 L. Ed. 269; United States v. Healey, 160 U. S. 136, 16 S. Ct. 247, 40 L. Ed. 369. And such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required. United States v. Johnston, 124 U. S. 236, 253, 8 S. Ct. 446, 31 L. Ed. 389; Hawley v. Diller, 178 U. S. 476, 488, 20 S. Ct. 986, 44 L. Ed. 1157." And Mr. Justice McKenna, in dealing with other Indian laws, in Blanset v. Cardin, 256 U. S. 319, 326, 41 S. Ct. 519, 522, 65 L. Ed. 950, said that the construction given the act by the Interior Department "is an assistant, if not demonstrative criterion, of the meaning and purpose of the act."

The departmental construction of these acts is not open to argument. On November 4, 1921 (after the Act of March 3, 1921, re-lied upon by appellant), the Attorney General advised the Secretary of the Interior that the mineral rights were the property of the tribe, subject to the control of the government; that Congress had the right to authorize the state of Oklahoma to levy a gross-production tax on minerals; that no individual member of the tribe had any right to object; that the members of the tribe had no vested interest in the royalties and that "Until they were placed to the credit of the individual Indian, they remained tribal funds." 33 Ops. Atty. Gen., 60, 62.

On August 15, 1922, the Solicitor of the Department rendered an opinion to the Secretary as to the validity of an assignment of an inherited interest in an allotment, attempted to be made by E. A. De Noya, an one-eighth-blood Osage with a certificate of competency. The opinion is directed to "the right of members of the Osage Tribe of Indians, Oklahoma, to assign oil and gas royalties accruing to them as members of that tribe." After a review of the statutes, the Solicitor concluded:

"True, individual members did obtain a prospective right to share in the periodical distributions of royalties received from leasing the deposits mentioned, after certain authorized deductions therefrom had first been made. In the absence of specific legislation by Congress, which has not been had, prospective rights of this nature, even in the hands of those members of the tribe who have received 'certificates of competency' or the restrictions against alienation of whose lands have otherwise been removed, are not assignable. * * * Payments of these funds in any other manner, or to persons other than as authorized by these statutes, is not warranted. * * * Again, and speaking generally, funds in the hands of administrative officers of the Government, whether for the benefit of Indians or otherwise, are not subject to attachment, levy, sale, execution, assignment, etc., in the absence of express legislation by Congress to that effect.

"I find no difficulty, therefore, in holding that members of the Osage Tribe, including those to whom certificates of competency have been issued or whose restrictions have otherwise been removed, are without power to assign their right to share in the oil and gas royalties and other funds accruing to them as members of that tribe, and, that such funds as and when due, can be paid only to such of these allottees or their heirs as may be competent; the shares due incompetent members to be further administered for their

benefit, as specifically provided for in the act of March 3, 1921."

On June 13, 1931, the Commissioner of Indian Affairs advised the Hon. Thomas D. Thacher, Solicitor General, that "this opinion has been subsequently followed by this Department." The Commissioner refers to legislation subsequent to this opinion, but states that the Department does not construe such legislation as affecting the assignability of such headrights. The Comptroller General has likewise so ruled. On November 27, 1928, a question was presented to him as to whether accrued quarterly payments could be made to the receiver of a white man who had inherited an interest in a headright. Since the Act of April 12, 1924, permitted persons of non-Indian blood to transfer the interest, the Comptroller authorized the payment. But he was dealing with a white man. The Comptroller was careful to say, however, that, even in that case, "the funds, so long as they remain tribal funds and not segregated, may not be paid to the receiver." On February 7, 1931, the Comptroller held that a bankrupt Osage Indian might revoke a power of attorney, coupled with an interest, to collect quarterly payments. The Comptroller based his opinion upon In re Dennison (D. C.) 38 F.(2d) 662, holding that the subject-matter of the power was not assignable.

Appellant urges that section 6 of the 1929 act makes provision for paying the debts of restricted Indians from their credits, and that, a fortiori, Congress must have intended that unrestricted Indians should pay their debts. Several sections deal with the payment of debts of restricted Indians; but restricted Indians were not paid all of their share of the quarterly accruals, and section 6 does not attempt to subject mineral rights to debts, but provides only that the debts shall be paid, when approved by the Superintendent, "out of the money of such Indian appearing to his credit." Furthermore, the unrestricted Indian could sell or mortgage his surplus or homestead; and since unrestricted Indians have valuable property to which creditors may look, Congress may have thought creditors of restricted Indians were therefore entitled to a consideration not due to creditors of the unrestricted. But if there is an anomaly in the situation, it is for Congress to correct.

Other negative inferences are drawn from other sections; for example, it is urged that the proviso in section 5 of the 1929 act that the trust funds shall not be subjected to forced sale for certain debts is an implied authority to subject such property to forced sale for all other debts. Some of the language, taken from the context, does carry the negative inference contended for. But inferences are only aids to construction; and in our opinion these inferences cannot prevail over the other matters heretofore discussed.

Counsel also rely upon Choteau v. Commissioner, decided by this court (38 F.(2d) 976) and affirmed by the Supreme Court (283 U. S. 691, 51 S. Ct. 598, 75 L. Ed. ——), and particularly some of the language in both opinions. But that language must be considered against the background of the facts. That case dealt only with moneys actually paid to and in possession of the individual Indian, which were his to do with as he pleased. What the case decided was that Congress had exercised its undoubted power to tax this income. We acknowledge the power of Congress to make these headrights alienable; what we hold is, that so far Congress has not done so. If the effort of the trustee in the case at bar were to reach funds which the Indian had received at the time of his adjudication, appellant's reference to the Choteau Case would be pointed. But that is not the effort here; the effort here is to reach future income that may come to the bankrupt from tribal property in which he has no present interest.

We conclude that no Indian of the Osage Tribe has the right to alienate his headright and that it is not subject to judicial process. The orders appealed from are affirmed.