**GLOBE INDEMNITY CO. v. BRUCE et al.***

**BRUCE et al. v. GLOBE INDEMNITY CO.**

**Nos. 1276, 1277.**

Circuit Court of Appeals, Tenth Circuit.

Dec. 9, 1935.

*Certiorari denied 56 S. Ct. 501, 80 L. Ed. ——.

Ralph A. Barney, of Pawhuska, Okl. (M. L. Holcombe, of Pawhuska, Okl., and Clarence Lohman, of Houston, Tex., were on the briefs), for Globe Indemnity Co.

H. W. Conyers, of Tulsa, Okl. (H. R. Duncan, of Tulsa, Okl., on the brief), for Robert C. Bruce and others.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

This is an action by C. L. Bruce, individually and as next friend for his minor children, Robert C. Bruce and Charles Neal Bruce, and his minor step-children, Marie Bowman LaSarge and Virgie Bowman, against the Globe Indemnity Company, the surety on the administrator's bond of A. Wade Patton, former administrator with the will annexed of the estate of Maude Bruce, the deceased wife of C. L. Bruce and mother of the minors above named.

Maude Bruce was a duly enrolled and allotted member of the Osage Tribe. She was of less than one-half degree Indian blood and possessed a certificate of competency for many years prior to her death. Bruce is a white person. The minors are less than one-half degree of Indian blood.

On October 21, 1924, Maude Bruce made her last will and testament under the terms of which she provided for the payment of all her just debts and funeral expenses, and devised her estate one-third to her husband, Charles Bruce, and the remainder to her four children, share and share alike.

Maude Bruce died on February 6, 1925. Thereafter her will was duly approved by the Secretary of the Interior, and on May 20, 1925 it was duly admitted to probate by the county court of Osage county, Oklahoma. On July 7, 1925, Patton was appointed administrator, with the will annexed. Patton as principal, and the Globe Company as surety, duly executed an administrator's bond in the penal sum of $10,-000, conditioned for the faithful execution of the duties of his trust according to law.

Patton as administrator received from the Superintendent of the Osage Indian Agency, $31,701.83, which had accumulated to the credit of the Osage headright of Maude Bruce after her death.

Under orders of the county court and with the approval of the Osage Indian Agency, Patton, as administrator, made disbursements from these funds as follows:

| | |
|---|---|
| In payment of family allowances, To the guardian of Charles Neal Bruce | $ 3830.00 |
| To the guardian of Robert Bruce | 3830.61 |
| To the guardian of Marie Bowman | 3732.50 |
| To the guardian of Virgie Bowman | 3612.50 |
| In payment of last illness and funeral expenses of Maude Bruce | 2514.55 |
| In payment of general claims... | 10090.00 |
| In payment of insurance and taxes | 564.83 |
| In payment of Executor's fees, attorney's fees, bond premiums, court costs, and other expenses of administration | 3224.62 |

On September 25, 1926, Bruce filed with the Secretary of the Interior a protest and objection to the use of any of the funds which accrued to the credit of the head-right of Maude Bruce after her death for the purpose of paying any of the claims or debts of the decedent. On March 16, 1927, Bruce wrote the Superintendent of the Osage Agency that he desired to withdraw such protest and objection.

On July 15, 1926, Bruce filed in the county court his petition for a determination of the heirs and a distribution of the estate. Patton, as administrator, filed objections thereto. On September 21, 1926, the county court entered an order denying the petition.

Bruce appealed from this order to the District Court of Osage county. The District Court reversed the order, insofar as it denied a determination of heirship, adjudged the surviving husband and four children to be the heirs at law of Maude Bruce, and affirmed the order insofar as it denied a distribution of the estate.

On September 4, 1929, Patton resigned as administrator, and on September 11, 1929, filed his final report. On January 17, 1930, a hearing was had thereon. At such hearing Bruce and the guardian for such minors were present in person and by their respective attorneys. At the hearing Bruce and the guardian for the minors objected to each of the payments made by the administrator to creditors of the estate on the ground that the moneys received by the administrator were not liable for claims of creditors. The county court surcharged Patton in the sum of $867.31, and otherwise approved the report. Bruce did not appeal from such order. The guardian appealed. On April 8, 1931, the District Court dismissed the guardian's appeal for failure to prosecute.

After the resignation of Patton, C. T. Evertson was appointed administrator with the will annexed. Patton paid the balance of $302.22 in his hands to Evertson. On March 31, 1931, Evertson filed in the county court, application to accept from the Globe Company, the sum of $867 in full settlement of its liability. The county court authorized such settlement. The Globe Company made payment and Evertson, as administrator, executed to the Globe Company a general release which was approved by the county court. Patton died prior to the commencement of this action.

His estate is insolvent and no administrator has been appointed therefor.

The trial court held the funds accruing to the headright of the decedent after the quarter in which she died, descended and were payable directly to the heirs of the decedent and were not assets of her estate subject to administration.

He gave credit for the disbursements for family allowance, and the expenses of the last illness and funeral expenses. He found that the minors were entitled to recover $4,452.57, and denied any recovery to Bruce for the reason that he had consented to the application of the funds in payment of claims of creditors. He held the Globe Company was estopped to assert that the funds received by Patton as administrator were not assets of the estate.

The broad question presented, is whether the county court acquired jurisdiction of the quarterly payments that accrued to the credit of the headright of Maude Bruce after her death.

The Globe Company, for the purposes of this case concedes that the county court erred in applying the accruals to this headright to the payment of general obligations. It stands upon the proposition that the headright and its accruals during the period of administration were within the jurisdiction of the county court, and any errors in the exercise of that jurisdiction must be corrected on appeal. The plaintiffs, on the other hand, concede that the county court has jurisdiction over accumulations to the headright during administration for the purpose of paying legacies, and jurisdiction over the accumulations during the quarter in which a decedent dies, for the purpose of paying certain debts. It has also been adjudicated (Mudd v. Perry (C.C.A.8) 25 F.(2d) 85) that the county court has jurisdiction over all of the property of an Osage to determine "who were rightful claimants to the estate of deceased allottees of the Osage Indian Tribe." But, the plaintiffs assert, the jurisdiction is limited to these three purposes.

It thus appears that the question precisely stated is a narrow one: Does the county court have jurisdiction over the headright and accumulations during administration subject to certain rules of law as to the proper exercise of that jurisdiction, or does it only have a jurisdiction over so much of the headright and accumulations as is necessary to pay legacies and certain

debts? It is apparent at once that the practicable and workable rule is that contended for by the Globe Company. If the county court errs in the exercise of its jurisdiction, its orders are subject to appeal, and in a relatively short time, the rights of the parties can be definitely established. And by section 3 of the Act of April 18, 1912, 37 Stat. 86, officers of the government are given power to guard against an improper exercise of power by the county court with respect to Osage estates. Under the rule contended for by the plaintiffs, the correctness of the rulings of the county court can be contested in any court, and at any time subject only to the statute of limitations, with a result that property rights are unsettled for indefinite periods of time. Furthermore, if, as must often be the case, it is necessary to sell a headright for the purpose of paying legacies or debts, it is quite impracticable to sell just so much of the headright as will return a sum sufficient to pay the legacies or debts, for no court can anticipate the precise amount which a portion of a headright will bring upon a judicial sale.

Furthermore, the rule contended for by the Globe Company is just. In these cases, administrators have received moneys sent them by the Secretary of the Interior, and paid them out strictly in accordance with the instructions of the Secretary of the Interior and the orders of the probate court. To require an administrator or his bondsman, under such circumstances, thereafter to enrich heirs at his personal expense, is grossly inequitable, to say the least.

Nevertheless, our answer must be found in the Acts of Congress relating to the Osage Indians. The pertinent provisions of such acts are stated or set forth in the subjoined note.[1]

The trust funds were segregated and credited to the individual members of the

---

[1] Act of June 28, 1906, 34 Stat. 539.

By sections 1 and 2 of such act, the roll of the tribe was provided for, and each of the 2,229 members enrolled was declared entitled to an equal share of the tribal land and tribal funds"; and provision was made for an allotment to each member of a homestead of 160 acres and surplus allotments of about 500 acres.

Section 3 of such act provides that the minerals are "reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six"; and that mineral leases shall be made by the tribe through its tribal council with the approval of the Secretary of Interior, the royalties to be determined by the President of the United States.

Section 4 of such act provides that all funds of the Osage Tribe, all moneys due, and all moneys that may become due or may be found to be due to the tribe shall be held in trust by the United States for the period of twenty-five years from and after January 1, 1907, except as in such act provided.

It is further provided that all the funds of the Osage Tribe of Indians, all moneys due or found to be due the tribe, and all moneys received from the sale of their lands in Kansas, should be segregated as soon as practicable after January 1, 1907, "and placed to the credit of the individual members of the * * * tribe on a basis of a pro rata division among" such members "as shown by the * * * roll of membership, * * * or to their heirs as hereinafter provided," that such funds should draw interest and that the interest thereon should "be paid quarterly to the members entitled thereto."

It further provided that the royalty received from oil, gas, and other mineral leases, from the sale of town lots and certain reservations, and from grazing leases should be placed "to the credit of the members of the * * * tribe" and "distributed to the individual members of said Osage tribe according to the roll * * * in the manner and at the same time that payments are made of interest on other moneys held in trust for the Osages by the United States."

Section 5 of such act provides:

"That at the expiration of the period of twenty-five years from and after the first day of January, nineteen hundred and seven, the lands, mineral interests, and moneys, herein provided for and held in trust by the United States shall be the absolute property of the individual members of the Osage tribe, according to the roll * * *, or their heirs, as herein provided, and deeds to said lands shall be issued to said members, or to their heirs, * * * and said moneys shall be distributed to said members, or to their heirs."

Section 6 of such act provides:

"That the lands, moneys, and mineral interests, herein provided for, of any deceased member of the Osage tribe shall descend to his or her legal heirs, according to the laws of the Territory of Oklahoma, or of the State in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which

Osage Tribe in 1907. The right to receive the trust funds and the mineral interests at the end of the trust period, and during that period to participate in the dis-

case said lands, moneys, and mineral interests must go to the mother and father equally."

Section 7 thereof provides:

"That the lands herein provided for are set aside for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided."

Act of April 18, 1912, 37 Stat. 86.

Section 3 of such act provides:

"That the property of deceased * * * allottees of the Osage Tribe * * * shall, in probate matters, be subject to the jurisdiction of the county courts of the State of Oklahoma."

Section 6 of such act provides for the partition of land of deceased Osage allottees; and that the proceeds of the sale belonging to competent heirs shall be paid directly to them without the intervention of an administrator.

Section 7 of such act provides:

"That the lands allotted to members of the Osage tribe shall not in any manner whatsoever be encumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency, or removal of restrictions on alienation; nor shall the lands or funds of Osage tribal members be subject to any claim against the same arising prior to grant of a certificate of competency. That no lands or moneys inherited from Osage allottees shall be subject to or be taken or sold to secure the payment of any indebtedness incurred by such heir prior to the time such lands and moneys are turned over to such heirs: Provided, however, that inherited moneys shall be liable for funeral expenses and expenses of last illness of deceased Osage allottees, to be paid upon order of the county court of Osage County, State of Oklahoma."

Section 8 of such act provides that any adult member of the Osage Tribe, not mentally incompetent may dispose "of any or all of his estate, real, personal, or mixed, including trust funds, from which restrictions as to alienation have not been removed, by will, in accordance with the laws of the State of Oklahoma"; but that such will shall not be admitted to probate, or be valid unless approved before or after the death of the testator by the Secretary of the Interior.

Act of March 3, 1921, 41 Stat. 1249.

This act (section 1) amended the act of June 28, 1906, so as to extend the reservation of the minerals to the tribe to April 7, 1946.

Section 3 of such act removed restrictions against alienation of both surplus and homestead allotments of all adult Osage Indians of less than one-half Indian blood.

Section 4 of such act provided that the Secretary of the Interior should cause "to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the royalties received during the previous fiscal quarter, and so long as the income is sufficient to pay to the adult members of said tribe not having a certificate of competency $1,000 quarterly except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians."

Act of April 12, 1924, 43 Stat. 94.

This act provided that a headright vested in a person not an Indian by blood might be sold with the approval of the Secretary of Interior.

Act of February 27, 1925, 43 Stat. 1008, 25 U.S.C.A. § 331, note.

Section 1 of such act (25 U.S.C.A. § 331 note) provides:

"That the Secretary of the Interior shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe of Indians in Oklahoma having a certificate of competency, his or her pro rata share, either as a member of the tribe or heir or devisee of a deceased member, of the interest on trust funds, the bonus received from the sale of oil or gas leases, the royalties therefrom and any other moneys due such Indian received during each fiscal quarter, including all moneys received prior to the passage of this Act and remaining unpaid; * * * and shall cause to be paid for the maintenance and education, to either one of the parents or legal guardians actually having personally in charge, enrolled or unenrolled, minor member under twenty-one years of age, and above eighteen years of age, $1,000 quarterly out of the income of each of said minors, and out of the income of minors under eighteen years of age, $500 quarterly."

Section 3 of such act (25 U.S.C.A. § 331 note) provides that lands devised to members of one-half or more Indian blood or members who do not have certificates of competency and lands inherited by such members shall be inalienable

tribution of the bonuses and royalties arising from the mineral estates and the inter- est on the trust funds, is an Osage head-right. See Quarles v. Dennison (C.C.A.

except with the approval of the Secretary of the Interior and that "property of Osage Indians not having certificates of competency purchased as hereinbefore set forth shall not be subject to the lien of any debt, claim, or judgment except taxes, or be subject to alienation, without the approval of the Secretary of the Interior."

Section 4 of such act (25 U.S.C.A. § 331 note) provides for revocation of certificates of competency of a member and that all just debts existing at the time of such revocation "shall be paid by the Secretary of the Interior, * * * out of the income of such member, in addition to the quarterly income herein before provided for."

Section 2 of such act (25 U.S.C.A. § 331 note) provides:

"All funds of restricted Osage Indians of one-half or more Osage Indian blood inherited by or bequeathed to them accruing to their credit and which are subject to supervision as above provided may, when deemed to be for the best interest of such Indians, be paid to the administrators of the estates of deceased Osage Indians or direct to their heirs, or devisees, in the discretion of the Secretary of the Interior, under regulations to be promulgated by him. The Secretary of the Interior shall pay to administrators and executors of estates of such deceased Osage Indians a sufficient amount of money out of said estates to pay all lawful indebtedness and costs and expenses of administration, when approved by him, and out of the shares belonging to heirs or devisees he shall pay the costs and expenses of such heirs or devisees, including attorneys' fees, when approved by him, in the determination of heirs or contest of wills."

Act of March 2, 1929, 45 Stat. 1478, 1480.

Section 2 of the act of February 27, 1925, was amended by section 4 of this act to read as follows:

"Upon the death of an Osage Indian of one-half or more Indian blood who does not have a certificate of competency, his or her moneys and funds and other property accrued and accruing to his or her credit and which have heretofore been subject to supervision as provided by law may be paid to the administrator or executor of the estate of such deceased Indian or direct to his heirs or devisees, or may be retained by the Secretary of the Interior in the discretion of the Secretary of the Interior, under regulations to be promulgated by him: Provided, That the Secretary of the In- terior shall pay to administrators and executors of the estates of such deceased Osage Indians a sufficient amount of money out of such estates to pay all lawful indebtedness and costs and expenses of administration when approved by him; and, out of the shares belonging to heirs or devisees, above referred to, he shall pay the costs and expenses of such heirs or devisees, including attorney fees, when approved by him, in the determination of heirs or contest of wills. Upon the death of any Osage Indian of less than one-half of Osage Indian blood or upon the death of an Osage Indian who has a certificate of competency, his moneys and funds and other property accrued and accruing to his credit * * *: Provided, That upon the settlement of such estate any funds or property subject to the control or supervision of the Secretary of the Interior on the date of the approval of this Act, which have been inherited by or devised to any adult or minor heir or devisee of one-half or more Osage Indian blood who does not have a certificate of competency, and which have been paid or delivered by the Secretary of the Interior to the administrator or executor shall be paid or delivered by such administrator or executor to the Secretary of the Interior for the benefit of such Indian and shall be subject to the supervision of the Secretary as provided by law."

Section 1 of such act extends the reservation to the tribe of the oil, gas, coal or other minerals until April 8, 1958, and provides that "all royalties and bonuses arising therefrom shall belong to the Osage Tribe of Indians, and shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law."

It further provides that "the lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns shall continue subject to such trust and supervision until January 1, 1959."

Section 5 of such act made section 6 of the Act of February 27, 1925, inapplicable to allotted and unallotted Osage Indians of less than one-half degree of Indian blood, and provided Osage lands and funds and any other property held in trust for Osage Indians of less than one-half degree of Indian blood should not be liable for a debt or obligation contracted before issuance of a certificate of competency.

10) 45 F.(2d) 585; Taylor v. Tayrien (C. C.A.10) 51 F.(2d) 884, 885; In re Irwin (C.C.A.10) 60 F.(2d) 495.

In Taylor v. Tayrien, supra, and Taylor v. Jones (C.C.A.10) 51 F.(2d) 892, we held the headright was not transferable by an Indian and therefore did not pass to his referee in bankruptcy. In Re Irwin, supra, we held a headright was transferable by a white, with the approval of the Secretary of the Interior.

We held that, in the hands of the Indian, the interest in the headright was contingent in that it was subject to the regulatory control of Congress; and that it was the policy of the government to conserve the headright in the hands of the Indian to protect him from his own improvidence. In re Irwin, supra, 60 F.(2d) 495, page 497.

It will be noted that under the Act of June 28, 1906, 34 Stat. 539, while all tribal funds and all moneys due, or to become due to the tribe were to be held in trust by the United States for a stated period, they were to be segregated and placed to the credit of the individual members of the tribe and interest thereon paid to such members quarterly; and that while the minerals were reserved to the tribe for a stated period, the royalties were to be paid to the individual members of the tribe at the time and in the manner interest on other moneys held in trust was paid; and that at the end of the trust period "the lands, mineral interests, and the moneys, * * * held in trust by the United States" were to "be the absolute property of the individual members of the * * * tribe, according to the roll * * *, or their heirs, as herein provided." 34 Stat. 544, § 5.

■ We are of the opinion that the United States took the legal title to the funds and moneys in trust, but that the beneficial title to the funds and moneys vested in the individual members of the tribe; that there was reserved to the tribe an interest in the minerals for a stated period; and that the reversionary interest in the minerals vested in the members of the tribe to whom were allotted the surface, all subject to the paramount power of Congress to deal with such property for the benefit of the tribe and its members.

This view is strengthened by a consideration of section 6 of the Act of June 28, 1906 (34 Stat. 545), which refers to "the lands, moneys, and mineral interests," of a "member of the Osage tribe," and provides such "lands, moneys, and mineral interests * * * shall descend to his or her legal heirs." This section indicates that a present equitable interest in the lands, moneys and mineral interests vested in the members of the tribe and on the death of a member descends to his heirs.

This view is further confirmed by the provisions of section 8 of the Act of April 18, 1912 (37 Stat. 88), which provides that any adult member of the tribe, not mentally incompetent, may by will dispose of any or all of his estate, real, personal or mixed including trust funds, from which restrictions have not been removed. This section provides that such wills shall not be admitted to probate until approved by the Secretary of the Interior. It has been the uniform practice of the Secretary of the Interior since the enactment of this section to approve wills, otherwise proper, which disposed of headrights of members of the tribe. The Secretary of the Interior approved such a will in the instant case. This practice recognized that a member has a vested reversionary interest in the minerals and a vested interest in the trust funds which he may dispose of by will.

■ Section 3 of the Act of April 18, 1912 (37 Stat. 86), provides that the "property" of deceased allottees shall in probate matters be subject to the jurisdiction of the county courts of Oklahoma.

Property is a term of very comprehensive meaning. It has been judicially defined as follows:

"Property is a term of very broad signification, embracing everything that has exchangeable value or goes to make up a man's wealth—every interest or estate which the law regards of sufficient value for judicial recognition." Samet v. Farmers' & Merchants' National Bank (C.C.A.4) 247 F. 669, 671.

"The term 'property' is said to be nomen generalissimum and to include everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value, or which goes to make up one's wealth or estate." Wapsie P. & L. Co. v. City of Tipton, 197 Iowa, 996, 193 N.W. 643, 645.

"And property is nomen generalissimum, and extends to every species of valuable right and interest, and includes real and personal property, easements, franchises and incorporeal hereditaments."

Boston & L. R. Corp. v. Salem & L. R. Co., 2 Gray (Mass.) 1, 35; Scranton v. Wheeler, 179 U.S. 141, 170, 21 S.Ct. 48, 45 L. Ed. 126.

Section 3, supra, does not restrict the meaning of the word property by any qualifying language. Had the Congress not intended the term property to embrace a headright it is reasonable to assume they would have used language restricting its broad signification. We conclude it embraces headrights of deceased members of the Osage Tribe.

County courts in Oklahoma have probate jurisdiction; to open and receive proof of last wills and testaments, and to admit them to proof and to revoke the probate thereof, to grant letters testamentary, of administration, and to revoke the same, to appoint appraisers of estates of deceased persons, to compel executors and administrators to render accounts, to order the sale of property of estates, to order the payment of debts due from estates, to order and regulate all distribution of property or estates of deceased persons, and to make such orders as may be necessary to the exercise of the powers conferred upon them. Section 1067, Okl.St. 1931.

In Work v. U. S. ex rel. Lynn, 266 U.S. 161, 45 S.Ct. 39, 41, 69 L.Ed. 223, the court said that section 3, supra, "expressly subjects to the jurisdiction of the local county courts the estates of Osages who are deceased."

In Mudd v. Perry (C.C.A.8) 25 F.(2d) 85, 86, the court said:

"The congressional act under observation provided that the property of the deceased allottees of the Osage Tribe of Indians 'shall, in probate matters, be subject to the jurisdiction of the county courts of the state of Oklahoma.' (37 Stat. 86.)

"This was a devolution by the Congress of judicial authority upon the county courts of Oklahoma to determine judicially, among other things, who were rightful claimants to the estate of deceased allottees of the Osage Indian Tribe. It was more than a mere selection of the county court for the performance of a ministerial or executive duty. It involved, as Con-

gress must have intended, a judicial inquiry. * * *

"Moreover, where jurisdiction over a new subject is conferred on a court of general jurisdiction, the jurisdiction conferred is to be exercised by it as such a court. 15 C.J. 815.

"The Constitution of Oklahoma (article 7, § 13) confers probate jurisdiction upon the county courts of that state in the following language:

" 'The county court shall have the general jurisdiction of a probate court. * * * It shall * * * transact all business appertaining to the estates of deceased persons, * * * including the * * * distribution of the estates thereof.' "

Section 1217, O.S. 1931, provides:

"The executor or administrator is entitled to the possession of all the real and personal estate of the decedent, and to receive the rents and profits of the real estate, except the realty and improvements thereon properly belonging to the homestead, and such personal property as is reserved by law to the widow and children of the decedent, or either of them until the estate is settled or delivered over by order of the county court to the heirs or devisees."

Construing this section the court said in Re Gentry's Estate, 158 Okl. 196, 13 P. (2d) 156, 159:

"Under the provisions of such a statute it is generally held that the administrator has the right to the possession of the real as well as the personal estate and may receive all rents and profits of the real estate until the estate is settled up and delivered over to the heirs by order of the probate court."

█ The legal title to personal property of a decedent who dies testate vests in the personal representative until it is distributed in accordance with the will.[2]

Section 7 of the Act of April 18, 1912 (37 Stat. 88), provides that inherited moneys shall be liable for funeral expenses and expenses of last illness of deceased Osage allottees, to be paid under order of the county court of Osage county.

---

[2] 11 R.C.L. p. 152, § 161; The American Law of Administration (Woerner 3d Ed.) Vol. II, p. 630, § 185; Brewster v. Gage (C.C.A.2) 30 F.(2d) 604, 605; Burnes v. Burnes (C.C.A.8) 137 F. 781, 787; Scruggs v. Scruggs (C.C.Mo.) 105 F. 28, 29.

Section 1615, O.S.1931, changes the common law rule only with respect to intestate property. See White House Lumber Co. v. Howard, 142 Okl. 163, 286 P. 327.

Clearly the county court acquires jurisdiction over the moneys of deceased Osage allottees to the extent of ordering payment of funeral expenses and expenses of last illness. Likewise it has jurisdiction over headrights charged with legacies by the last wills of competent adult members of the Osage Tribe in order to direct the payment of such legacies.

But it is contended that the probate court has no jurisdiction to receive or distribute quarterly payments accruing to the headright of a deceased allottee after his death, and that such payments must be made directly to the heirs, devisees or legatees of the decedent under section 4 of the Act of June 28, 1906 (34 Stat. 544), section 4 of the Act of March 3, 1921 (41 Stat. 1250), and section 1 of the Act of February 27, 1925 (25 U.S.C.A. § 331 note).

If the lands, trust funds, and mineral interests are subject to the jurisdiction of the county courts of Oklahoma, it would seem that the quarterly payments arising therefrom would be subject to that jurisdiction during the pendency of the administration and until the settlement of the estate.

■ The personal property of a decedent which passes to the administrator or executor pending administration, includes earnings, income, increase, accretions and accessions of and to such property including those that arise after the death of the decedent pending administration.[3]

■ After the payment of lawful debts it is the duty of the administrator to make distribution of the decedent's property in the manner directed by the will, as in payment of legacies or in case of intestacy in the manner prescribed by law.[4]

■ It was the duty of the administrator with the will annexed of Maude Bruce to pay the costs of administration, the funeral expenses, the expenses of last illness, and the legacies provided for in the will.

■ We are of the opinion that Patton as administrator was authorized to receive the quarterly payments which accrued to the headright of Maude Bruce after her death, to pay the costs of administration, to discharge any valid debts to the payment of which the quarterly payments could lawfully be applied, and to distribute the balance in accordance with the provisions of her will.

The construction we have placed on the acts of Congress above adverted to, is in accord with rulings of the Departments of the Interior and Treasury and a long administrative practice. See Opinion Solicitor Department of Interior, May 25, 1915, D. -29630; Opinion Comptroller of Treasury, March 11, 1916, 22 Comp. Dec. 457; Opinion Solicitor Department of Interior, May 25, 1922. Such rulings were followed with respect to the estate of Maude Bruce.

■ The construction of a statute by a department of the government charged with its execution is entitled to great weight and should not be overturned without cogent reasons.[5]

■ With such rulings and long continued administrative practice before it, the Congress enacted section 2 of the Act of February 27, 1925 (25 U.S.C.A. § 331 note). It will be noted that this section dealt with restricted funds inherited by, or bequeathed to Osage Indians of one-half or more Osage Indian blood and in no wise changed the existing practice with respect to heirs or legatees of less than one-half Indian blood. Had Congress intended to change the settled practice in any particular except in respect to funds inherited by, or bequeathed to restricted Osage Indians of one-half or more Osage Indian blood it is reasonable to assume they would have manifested that intention by clear language.

Maude Bruce, Robert C. Bruce, Charles Neal Bruce, Marie Bowman and Virgie Bowman were all of less than one-half

---

[3] In re Merchant, 39 N.J.Eq. 506; Wingate v. Pool, 25 Ill. 118; Harding v. Harding, 151 Ky. 398, 152 S.W. 259, 261; The American Law of Administration (Woerner 3 Ed.) Vol. II, p. 983.

[4] Swanberg v. National Surety Co., 86 Mont. 340, 283 P. 761, 768; McKenzie v. Jensen, 212 Ala. 92, 101 So. 755, 757; Bemis v. Fletcher, 251 Mass. 178, 146 N. E. 277, 280, 37 A.L.R. 1471; McGehee v. McGehee, 190 N.C. 476, 130 S.E. 115, 116; Wright v. Menefee, 226 Ala. 55, 145 So. 315, 317; In re McKallip's Estate,

291 Pa. 304, 139 A. 839; Bliss v. Spencer, 125 Va. 36, 99 S.E. 593, 5 A.L.R. 619.

[5] U. S. v. Jackson, 280 U.S. 183, 193, 50 S.Ct. 143, 74 L.Ed. 361; U. S. v. Cerecedo Hermanos Y Compania, 209 U. S. 337, 339, 28 S.Ct. 532, 52 L.Ed. 821; Federal Land Bank v. Warner, 292 U. S. 53, 55, 54 S.Ct. 571, 78 L.Ed. 1120, 91 A.L.R. 380; City of Tulsa v. Southwestern Bell Tel. Co. (C.C.A.10) 75 F. (2d) 343, 349; Taylor v. Tayrien (C.C. A.10) 51 F.(2d) 884, 891.

Osage Indian blood. C. L. Bruce is not of Indian blood. Therefore section 2 of the Act of February 27, 1925, in no wise affected the estate of Maude Bruce, or the rights of the beneficiaries under her will.

Section 4 of the Act of March 2, 1929 (45 Stat. 1480), divided the estates of deceased Osage Indians into two classes: (1) Estates of Osage Indians of one-half or more Indian blood who do not at the time of death have certificates of competency, and (2) estates of Osage Indians of less than one-half Indian blood or who at the time of death have certificates of competency.

Maude Bruce was of less than one-half Indian blood and at the time of her death had a certificate of competency. Her estate, therefore, fell in the second class. Her heirs and devisees were of less than one-half Indian blood. Therefore, with respect to her estate, the existing practice was in no wise changed by section 4 of the Act of March 2, 1929. It authorized the existing practice as to estates of Osage Indians of less than one-half Indian blood or who at the time of their death have certificates of competency.

In DeNoya v. Arrington, 163 Okl. 44, 20 P.(2d) 563, the court held that quarterly payments accruing to the headright of a deceased Osage Indian after the quarter in which the decedent died, are not assets of the estate of such decedent which can be lawfully applied in payment of claims of creditors.

It further held that the word "accruing" in section 4, supra, embraces only the quarterly payment for the quarter in which the decedent dies.

With the latter holding we do not agree. It will be noted that section 4, supra, in part provides:

"Upon the death of any Osage Indian of less than one-half of Osage Indian blood or upon the death of an Osage Indian who has a certificate of competency, his moneys and funds and other property accrued and accruing to his credit shall be paid and delivered to the administrator or executor of his estate to be administered upon according to the laws of the State of Oklahoma."

The word accrue is defined in Webster's New International Dictionary as follows:

"To increase; augment. To come by way of increase; to arise or spring as a growth or result; to be added as increase, profit. * * *"

Accruing means arising by way of increase, growth or profit. It connotes continuing growth, increase or augmentation.

It will be observed the act speaks of moneys, funds and property accrued and accruing to the credit of the owner of the headright, not of quarterly payments accrued or accruing to such owner. We see no reason for construing the words accrued and accruing as referable to quarterly payments.

Interest on trust funds and the mineral royalties are constantly accruing to the credit of owners of headrights. On the death of the owner of a headright, certain interest on trust funds and mineral royalties will have accrued to his credit. The word accruing cannot refer to them. It must refer to those that arise after the death of the owner of the headright. We hold the word "accrued" refers to interest and royalties that have arisen to the credit of the owner of the headright at the time of his death and the word "accruing" refers to the interest and royalties that will arise to the credit of his headright after his death and prior to the distribution of his estate.

Furthermore, other provisions of section 4, supra, indicate Congress so intended. With respect to estates of Osage Indians of one-half degree Indian blood or more, who do not have certificates of competency it provides "that the Secretary of the Interior shall pay to administrators and executors of the estates of such deceased Osage Indians a sufficient amount of money out of such estates to pay all lawful indebtedness[6] and costs and expenses of administration." It is unreasonable to suppose that Congress did not intend that funds should be made available to the same extent for payment of costs of administration and "lawful indebtedness"[6] of estates of Osage Indians of less than one-half Indian blood or who at the time of death have certificates of competency. The failure of Congress to make similar provision for payment of the costs of administration and lawful indebtedness of estates of the last mentioned class, indi-

---

[6] As to whether Congress by the phrase "lawful indebtedness" referred only to funeral expenses and the expenses of the last illness of the decedent or intended it to embrace general claims against his estate, for the reason hereinafter stated, we express no opinion.

cates that Congress intended all of the funds accruing to such estates pending administration should be paid to the personal representatives, and therefore deemed such provision unnecessary.

Moreover, payments accruing after the quarter in which the decedent dies could be lawfully applied in payment of costs of administration, expenses of the last illness and funeral expenses of the decedent and legacies under the will and the county court would have jurisdiction over them for those purposes.

We conclude the probate court had jurisdiction over the headright of Maude Bruce and the quarterly payments accruing thereto after her death, pending the administration and distribution of her estate.

■ If the Probate Court had jurisdiction over the headright and the quarterly payments accruing thereto pending the administration of the estate, its orders directing the payment of claims and the distribution of the estate are not subject to collateral attack. Doran v. Kennedy, 237 U.S. 362, 35 S.Ct. 615, 59 L.Ed. 996; Folk v. Monsell (C.C.A.10) 71 F.(2d) 816. Therefore the question whether the headright and the quarterly payments, or either of them, could be resorted to for the discharge of general claims against the estate of Maude Bruce, is not presented and we express no opinion thereon.

■ Under the weight of authority, the liability of sureties on an administrator's or executor's bond does not extend to property which does not constitute assets of the estate even though the personal representative has taken possession of such property and treated it as assets of the estate. The personal representative cannot extend the liability of the surety by taking possession of property not an asset of the estate.[7]

■ The Supreme Court of Oklahoma applied the same principle to the bond of a court clerk in Hughes v. Board of Commissioners, 50 Okl. 410, 150 P. 1029, and to the bond of a sheriff in Jordon v. Neer, 34 Okl. 400, 125 P. 1117. In Boudinot v. Locust, 55 Okl. 662, 151 P. 579, 155 P. 698, the court held that where an administrator, receives and accepts funds as an administrator, neither he nor the sureties on his bond will be permitted to deny that such funds were assets of the estate. But the principle of that case has no application here. The Globe Company does not assert the quarterly payments were not assets of the estate. It asserts that they were. But the plaintiffs, as the very foundation for their action, allege that the quarterly payments were not assets of the estate, and that Patton as administrator was not entitled to receive them. They may not insist that the surety is estopped to assert a fact which they affirm as the basis for their cause of action.

■ It follows that if the quarterly payments were assets of the estate and were lawfully paid to Patton as administrator, and by him disbursed in accordance with the orders of the county court, the surety is not liable; and if they were not assets of the estate and were improperly received and disbursed by Patton as administrator, the bond does not extend to them and the surety is not liable.

The judgment is reversed and the cause remanded for a new trial.

BRATTON, Circuit Judge (specially concurring).

I think the sums which accrue to a headright after the death of an Osage Indian pass by virtue of the act of 1906 directly to his heirs subject only to payment of last illness and funeral expenses and to discharge bequests. The act of 1912 vested the probate courts in Oklahoma with jurisdiction of only so much of such funds as was necessary to pay such expenses and perhaps bequests. The courts were not vested with jurisdiction over the balance because it was not property of the decedent. Instead, it was property of the heirs. But the administrative department, charged with the duty of administering the pertinent acts, construed them otherwise and throughout a period of almost twenty years it consistently approved payment of all of such money to executors and administra-

---

[7] Commercial Nursery Co. v. Ivey, 164 Tenn. 502, 51 S.W.(2d) 238, 239; Carcaba v. McNair (C.C.A.5) 68 F.(2d) 795, 797; National Surety Co. v. Wages, 48 Ga. App. 720, 173 S.E. 451; Probate Court v. Williams, 30 R.I. 144, 73 A. 382, 388, 19 Ann.Cas. 554; People v. Petrie, 191 Ill. 497, 61 N.E. 499, 504, 85 Am.St.Rep. 268; Bank of Newton County v. American Bonding Co., 141 Ga. 326, 80 S.E. 1003, 1004, 50 L.R.A.(N.S.) 1089; Bradford v. Watson, 65 Fla. 461, 62 So. 484; Campbell v. American Bonding Co., 172 Ala. 458, 55 So. 306.

'tors, some of which was used to pay general debts of estates. The question is not free from doubt, and under repeated decisions the construction which an administrative department consistently places upon a statute of doubtful interpretation over a long period of time is strongly persuasive and will not be overthrown unless it is clearly wrong. United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361; Taylor v. Tayrien (C.C.A.) 51 F.(2d) 884; United States v. La Motte (C.C.A.) 67 F. (2d) 788; City of Tulsa v. Southwestern Bell Tel. Co. (C.C.A.) 75 F.(2d) 343. I concur in the reversal on that ground.